**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *Petitioner*, <br><br> v. <br><br> BONNEVILLE POWER ADMINISTRATION, *Respondent*, <br><br> CITIZENS UTILITY BOARD OF OREGON; EUGENE WATER & ELECTRIC BOARD; IDAHO POWER COMPANY; NORTHWEST REQUIREMENTS UTILITIES; PUGET SOUND ENERGY, INC.; PACIFICORP; PACIFIC NORTHWEST GENERATING COOPERATIVE; PUBLIC POWER COUNCIL; PUBLIC UTILITY COMMISSION OF OREGON; PUBLIC UTILITY DISTRICT NO. 1 OF COWLITZ COUNTY, WASHINGTON; PUBLIC UTILITY DISTRICT NO.1 OF SNOHOMISH COUNTY, WASHINGTON; PUBLIC UTILITY DISTRICT NO. 1 OF BENTON COUNTY, WASHINGTON; THE CITY OF SEATTLE, *Respondents-Intervenors*. | No. 11-73178 <br><br><br> OPINION |

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
February 19, 2013—Portland, Oregon

Filed October 28, 2013

Before: Arthur L. Alarcón, Stephen S. Trott,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Alarcón

## SUMMARY[*]

### Bonneville Power Administration

The panel denied a petition for review of a decision of the
Bonneville Power Administration adopting the Residential
Exchange Program Settlement Agreement, which set terms
for refunding energy customers who were previously
overcharged and set new rate terms for the next seventeen
years.

The panel held that the Association of Public Agency
Customers, a group whose members were not direct
customers of the Bonneville Power Administration ("BPA"),
had constitutional and prudential standing to challenge the

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Settlement, due to the "pass-through" contracts under which its members paid rates that directly reflected the rates that the BPA charged its direct customers. Concerning the merits, the panel held that the Settlement complied with the relevant statutory requirements of the Pacific Northwest Electric Power and Conservation Act, the Bonneville Project Act, and regulations of the Federal Energy Regulatory Commission, and with the court's prior decisions in *Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009 (9th Cir. 2007), and *Golden Nw. Aluminum, Inc. v. BPA*, 501 F.3d 1037 (9th Cir. 2007). The panel also held that the Settlement did not improperly bind non-settling parties to the Agreement. Finally, the panel held that the BPA Administrator's adoption of the Settlement in the Record of Decision was not arbitrary and capricious.

Judge Alarcón dissented because he would hold that Association of Public Agency Customers lacked Article III standing, and therefore the court lacked jurisdiction to reach the merits of the case.

## COUNSEL

Kathleen M. Sullivan (argued), Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; Michael Alcantar and Donald Brookhyser, Alcantar & Kahl, LLP, Portland, Oregon; Michael N. Kunselman, Alston & Bird, LLP, Washington, D.C.; John M. Rochefort, Alston & Bird, LLP, Los Angeles, California; Judith Endejan, Graham & Dunn, PC, Seattle, Washington; Jason N. Poulos, Weinberg Wheeler Hudgins Gunn & Dial, Atlanta, Georgia, for Petitioner.

Kurt R. Casad (argued), Special Assistant United States Attorney, S. Amanda Marshall, United States Attorney, Stephen J. Odell, Assistant United States Attorney, Richard A. Greene, Special Assistant United States Attorney, Portland, Oregon; Randy A. Roach and Timothy A. Johnson, Bonneville Power Administration, Portland, Oregon, for Respondent.

Jay T. Waldron (argued) and Sara Kobak, Schwabe Williamson & Wyatt, PC, Portland, Oregon; Donald G. Kari and Jason Kuzma, Perkins Coie, LLP, Bellevue, Washington; Michael G. Andrea, Avista Corporation, Spokane, Washington; Scott G. Seidman, Tonkon Torp, LLP, Portland, Oregon; Dan L. Bagatell, Perkins Coie, LLP, Phoenix, Arizona; Ryan L. Flynn, Pacificorp, Portland, Oregon; R. Blair Strong, Paine Hamblen, LLP, Spokane, Washington, for Intervenors PacificCorp., et al.

Paul M. Murphy (argued), Murphy & Buchal, LLP, Portland, Oregon; Sarah Dennison-Leonard, Portland, Oregon, for Intervenors Northwest Requirements Utilities, et al.

Stephanie Andrus, Assistant Attorney General, Salem, Oregon; Donald L. Howell, II, Deputy Attorney General, Boise, Idaho; G. Catriona McCracken and Raymond W. Myers, Citizens' Utility Board of Oregon, Portland, Oregon, for Intervenors Idaho Public Utilities Commission, et al.

**OPINION**

PAEZ, Circuit Judge:

In this opinion, we consider whether a settlement agreement between the Bonneville Power Administration ("BPA") and a large number of its customers is lawful. We invalidated a previous settlement between BPA and a class of customers because it did not comply with the Pacific Northwest Electric Power Planning and Conservation Act ("NWPA"). *See Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009, 1036–37 (9th Cir. 2007) ("PGE"); *Golden Nw. Aluminum, Inc. v. BPA*, 501 F.3d 1037, 1048 (9th Cir. 2007) ("Golden Nw."). On remand, BPA initiated a complex rate-making process, under which it calculated both (1) overcharges resulting from the unlawful settlement, and (2) new rates, intended to comply with *PGE* and *Golden Northwest.* Its customers, in turn, filed numerous petitions for review in this court, challenging various aspects of BPA's rate-making.[1]

In the face of potentially unending litigation, BPA and a large number of its customers entered into the Residential Exchange Program Settlement Agreement ("REP-12 Settlement Agreement" or "Settlement"). Record of Decision ("ROD") 14.[2] The Settlement sets terms for refunding

---

[1] At the time of the BPA Administrator's final decision in this case, there were 56 petitions pending before the Ninth Circuit "on issues related to BPA's establishment of its power rates." Record of Decision 13.

[2] The REP-12 Record of Decision is contained in BPA's supplemental excerpts of record, filed with the court. It is also available at

customers who were previously over-charged, as well as setting terms—including a new rate-making methodology—for the next seventeen years. After a thorough evaluation, the BPA Administrator issued the REP-12 Record of Decision, a final agency action, in which he adopted the Settlement and committed BPA to abide by its terms.

In its petition for review, the Association of Public Agency Customers ("APAC") challenges the Settlement, alleging that it violates several provisions of the NWPA, 16 U.S.C. §§ 839c(c), 839e(b), the Bonneville Project Act, 16 U.S.C. § 832d(a), regulations of the Federal Energy Regulatory Commission, 18 C.F.R. §§ 300.1(b)(6), 300.21(e)(1), and this court's decisions in *PGE* and *Golden Northwest*.[3] In response, BPA and the intervening parties argue, in part, that APAC's members lack standing to bring this challenge, because they are merely the customers of BPA's customers, not direct customers themselves.[4] We conclude that APAC has standing to challenge the Settlement, due to the "pass-through" contracts under which its members pay rates that directly reflect the rates BPA charges its direct

---

http://www.bpa.gov/Finance/ResidentialExchangeProgram/Pages/default.aspx. We cite to the page numbers of the Record of Decision, rather than to the parties' supplemental excerpts of record.

[3] APAC's petition was initially consolidated with *Alcoa Inc. v. BPA*, No. 11-73161. However, BPA and Alcoa later reached a settlement of their dispute and agreed to dismiss that action under Rule 42(b) of the Federal Rules of Appellate Procedure. We dismissed Alcoa's petition with prejudice on December 18, 2012.

[4] The intervening parties are: a group of investor-owned utilities ("IOUs"), a group of consumer-owned utilities ("COUs"), and the Citizens' Utility Board of Oregon. All intervening parties urge the court to dismiss or deny APAC's petition.

customers. With respect to the merits, however, we conclude that the Settlement complies with the relevant statutory requirements and with our prior decisions, and we therefore deny APAC's petition for review.

## I. BACKGROUND

We have previously chronicled the history of BPA, a federal agency that markets power generated by federal hydroelectric projects in the Columbia River Basin. *See, e.g.*, *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 779 (9th Cir. 2012); *Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 797–800 (9th Cir. 2009); *Golden Nw.*, 501 F.3d at 1041; *PGE*, 501 F.3d at 1013–16; *Pub. Power Council, Inc. v. Bonneville Power Admin.*, 442 F.3d 1204, 1206 (9th Cir. 2006); *M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 836–37 (9th Cir. 2002) (as amended); *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1163–65 (9th Cir. 1997) ("APAC"). Nevertheless, because of the complexity of the case, we begin with a brief review of the relevant history of the agency and provisions of the NWPA, one of "the tangle of statutes that govern [BPA's] operations." *Golden Nw.*, 501 F.3d at 1042.[5] We then discuss the specific facts relevant to this appeal.

---

[5] "BPA's authority to market power is derived from four separate acts: the Bonneville Project Act; the Regional Preference Act of 1964, 16 U.S.C. §§ 837–837k (2000); the Federal Columbia River Transmission System Act, 16 U.S.C. §§ 838–838k (2000); and the [NWPA], 16 U.S.C. §§ 839–839h (2000)." *PGE*, 501 F.3d at 1014 n.2. BPA "originally operated under an annual congressional appropriation, but was restructured as a self-financed agency in 1974." *Id.* at 1014.

A.

Congress created BPA, an agency within the Department of Energy, in 1937.  *PGE*, 501 F.3d at 1013.  The agency was initially "tasked with marketing the power generated by federally owned dams on the Columbia River."  *Id.*  For the first thirty years of its existence—from the 1930s through the 1960s—BPA had sufficient resources to meet the power demands of two classes of customers.  *Id.* at 1014.  First, BPA provided power to "preference utilities," also known as "consumer-owned utilities" or "COUs."  This class consists of publicly-owned utilities, cooperatives, and federal agencies, who are accorded priority to federal power under the Bonneville Project Act.  *Id.*; *see also* 16 U.S.C. § 832c(a), (d).    Second, BPA provided power to "non-preference utilities."  *PGE*, 501 F.3d at 1014.  This class of customers is made up of two sub-classes: (1) investor-owned utilities ("IOUs"), who purchase power for re-sale, and (2) direct service industrial customers ("DSIs"), who purchase power for direct consumption.  *Id.*; *see also APAC*, 126 F.3d at 1164.

As demand for low-cost federal power rose in the 1970s, BPA forecast that it would be unable to meet all of its customers' power needs by the end of the decade.  *PGE*, 501 F.3d at 1014.    An "uncertain and unstable" period followed, during which BPA advised non-preference customers—and, later, preference customers—of its looming inability to provide them with power.  *APAC*, 126 F.3d at 1165; *see also PGE*, 501 F.3d at 1014.  As a result, many non-preference customers were forced to purchase power elsewhere, "at a severe cost disadvantage in the marketplace." *Id.*

B.

In response to the pending energy crisis, Congress enacted the NWPA in 1980. The NWPA "transformed BPA from an agency that merely sold whatever power was available from generating facilities in the Federal Columbia River Power System to one charged with the responsibility of meeting the region's future power needs." *APAC*, 126 F.3d at 1165. Of particular importance here, the statute authorizes BPA to "exercise greater control over its power supply and to augment that supply by purchasing electric power in the market." *PGE*, 501 F.3d at 1014. It also authorizes the BPA Administrator to "establish and revise the rates at which BPA's power is sold," and—subject to certain limitations—to "enter into contracts, agreements, and settlements of claims and contractual obligations." *Id.* Two of the provisions granting BPA such authority, section 5, 16 U.S.C. § 839c, and section 7, 16 U.S.C. § 839e, are at issue in this appeal.

1.

Section 5(c) of the NWPA makes low-cost power available to IOUs, one of the classes of non-preference customers. Under this provision, IOUs are entitled to "exchange power they have purchased or generated for lower-cost power generated by BPA." *PGE*, 501 F.3d at 1015; *see also* 16 U.S.C. § 839c(c)(1); *Golden Nw.*, 501 F.3d at 1047. This process, known as the Residential Exchange Program ("REP"), "essentially acts as a cash rebate to the IOUs," allowing the IOUs to benefit from BPA's low rates even when BPA cannot itself provide them with power. *PGE*, 501 F.3d at 1015 (explaining that the "'exchange' is a paper

transaction").[6]  The IOUs, in turn, are required to pass on this financial benefit to their customers.  16 U.S.C. § 839c(c)(3); *see also Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1460 (9th Cir. 1986) (explaining that without the REP, "consumers living in areas served by private utilities faced higher power prices than consumers living in areas served by public utilities").

The traditional formula for deciding if an IOU is entitled to a "REP Benefit" is as follows:  first, the IOU offers to sell power to BPA at its "average system cost" ("ASC") for producing power.[7]  Second, BPA calculates the "PF Exchange rate," which is the sum of a base rate for power, *see* 16 U.S.C. § 839e(b)(1), plus any supplemental charges triggered by the "rate ceiling," *see id.* at (b)(3), discussed *infra*.  If the PF Exchange rate is lower than the ASC, the IOU is entitled to a REP Benefit, which will be the difference between those two

_____

[6] Section 5(c) technically makes REP benefits available to any qualified utility, including COUs.  *See* 16 U.S.C. § 839c(c)(1).  But it was intended primarily to benefit the IOUs, and the Settlement guarantees REP benefits only to IOUs.  *See Washington Utilities & Transp. Comm'n (WUTC) v. F.E.R.C*., 26 F.3d 935, 936–37 (9th Cir. 1994) ("The exchange program is designed to eliminate the disparities between electric rates paid by residential customers of IOUs and the lower rates paid by customers of publicly-owned utilities").  For these reasons, and for the sake of clarity, we refer to "IOUs," rather than "utilities," as the relevant beneficiaries of section 5(c).

[7] BPA determines an IOU's ASC "on the basis of methodology developed for this purpose in consultation with the [Pacific Northwest Electric Power and Conservation Planning] Council, the Administrator's customers, and appropriate State regulatory bodies in the region." 16 U.S.C. § 839c(c)(7).  The ASC methodology is subject to review and approval by the Federal Energy Regulatory Commission ("FERC"). BPA's current methodology was developed in 2008 and approved by FERC in 2009.  ROD 3.

amounts, multiplied by the IOU's residential load.  *See* 16 U.S.C. § 839c(c)(1) (stating that the Administrator "*shall* acquire by purchase such power and *shall* offer, in exchange, to sell an equivalent amount of electric power" (emphasis added)); ROD 2.

2.

While section 5 provides low-cost power to the IOUs, section 7 ensures that the preference customers—i.e., the COUs—will not bear the cost of this benefit.  *See PGE*, 501 F.3d at 1015 ("The legislative history of the NWPA suggests that Congress viewed the NWPA as a compromise between the preference and non-preference utilities"). Section 7 governs the rates that BPA charges its customers, *Golden Nw.*, 501 F.3d at 1041, and it contains two relevant restrictions.

First, BPA may not charge its preference customers higher rates than it would in the absence of the REP. 16 U.S.C. § 839e(b)(2)(C).[8]  In order to ensure this does not happen, BPA is required to perform a "rate test," through which it compares the "PF Public rate"—i.e. the projected rate for the COUs—to a hypothetical rate based on five assumptions, including the assumption that no exchanges were made through the REP.  *Id.* at (A)–(E).  If the "rate test" shows that the PF Public rate is higher than the hypothetical rate, BPA must adjust the PF Public rate downward by the

---

[8] The rate that BPA charges its preference customers is the "Priority Firm Public rate," or "PF Public rate."  *See* ROD xi, 180, 185, 330; *see also* 16 U.S.C. §§ 839c(b), 839e(b); *Pac. Nw. Generating Co-op.*, 580 F.3d at 802.  This rate is also referred to as the "PF Preference rate." ROD 7; *see also* ROD 203.

amount of the difference.  This is called the "rate ceiling" trigger.

The triggering of the "rate ceiling" leads to the second restriction:  if the PF Public rate is adjusted downward, the cost of making such an adjustment must be recovered from all of the *other* rates BPA charges for power, including the PF Exchange rate that BPA sets for the IOUs.  *Id.* at (b)(3).  This brings us somewhat full circle:  the practical effect of adding a supplemental charge to the PF Exchange rate charged to IOUs is simply a reduction in REP Benefits for the IOUs. *See PGE*, 501 F.3d at 1015.

## C.

Put simply, the REP is complicated.  It was the source of "almost continuous litigation" in the 1980s, during which period many IOUs chose to settle with BPA rather than actively participate in the program.  ROD 5; *see also Cal. Energy Res. Cons. & Dec. Comm'n v. Johnson*, 807 F.2d 1456, 1458 (9th Cir. 1986).  And it was at the heart of the 2000 REP Settlement Agreement, which this court struck down in *PGE* and *Golden Northwest.*

In the 2000 REP Settlement Agreement, BPA attempted to settle its REP obligations to the IOUs for fiscal years 2002–2011.  *Golden Nw.*, 501 F.3d at 1047.  It then adjusted the rates for the COUs upward, in order to recover the costs associated with the settlement.  *Id.* at 1048.  We held that BPA's actions were contrary to the NWPA.  In *PGE*, we held—contrary to BPA's argument—that BPA must comply with sections 5 and 7 "*whenever* [it] engages in a purchase and exchange of power," including in settlement agreements. 501 F.3d at 1032 (emphasis added).  We concluded that BPA

had failed to do so, because the settlement did not rely on the IOUs' current ASCs—that is, the rates at which the IOUs offer to sell power to BPA—when calculating their REP settlement benefits. *Id.* at 1033; *see also id.* at 1037 (concluding that the settlement did not "resemble the REP program created in §§ 5(c) and 7(b) that it purports to be settling").[9] And in *PGE*'s companion case, *Golden Northwest*, we further held that it was a violation of section 7(b) for BPA to distribute the costs of the settlement to its preference customers. 501 F.3d at 1048. We remanded both cases to BPA to set rates in accordance with our opinions.

On remand, BPA initiated proceedings to set new rates in compliance with *PGE* and *Golden Northwest*. This resulted in several final decisions: (1) the "WP-07 Supplemental Record of Decision," which set a refund schedule for past over-charges from the unlawful 2000 settlement, (2) the "2008 Residential Purchase and Sale Agreement Record of Decision," which applied specifically to IOUs, and (3) the "WP-10 Record of Decision," which established future rates for 2010–2011. The details of these decisions do not matter here. What does matter is that each of these decisions resulted in an onslaught of appeals to this court, which have been stayed pending the outcome of this case. ROD 29.

---

[9] We explained that BPA had erroneously relied on a "set of assumptions . . . [that] served to enlarge the group of IOUs eligible for the settlement and to increase the benefits of those already qualified for the REP," including (1) the possibility of a legal challenge to the methodology for rate-making, despite the lack of any such existing challenge, (2) the possibility of a challenge to the PF Exchange rate, and (3) future fluctuations in the energy market. *PGE*, 501 F.3d at 1033.

D.

Against this backdrop, we turn to the subject of this appeal: the REP-12 Record of Decision. In the face of "seemingly endless litigation" over the REP, a large number of BPA's customers entered into settlement negotiations.[10] This resulted in the REP-12 Settlement Agreement, which was signed by parties representing 94 percent of the total load that BPA serves.[11] The Settlement was then submitted to the BPA Administrator, who conducted a seven-month evaluation to determine if it was reasonable and if it complied with BPA's statutory mandates, as well as with *PGE* and *Golden Northwest.* After concluding that the Settlement was lawful and reasonable, the BPA Administrator adopted it and committed BPA to abide by its terms. ROD 419. The REP-12 Record of Decision replaces the Administrator's previous REP-related decisions. *See* ROD 20; 29.

Although the Settlement includes "many complicated formulas and terms," ROD 29, its three key elements can be described succinctly. First, the Settlement sets a lump sum of REP benefits to be paid to the IOUs as a class over the seventeen-year term of the settlement.[12] These lump sums are

---

[10] The BPA Administrator publicly urged customers to work toward a settlement that would "provide greater long-term certainty" and "greater political equity" than what BPA could provide on its own. ROD xvii.

[11] The settling parties consist of all six regional IOUs, three public utility commissions, several customer representative groups, the Citizens' Utility Board of Oregon, and 89.1 percent (by load) of the COUs.

[12] The lump sum allocated to the IOUs reflects the resolution of all disputed claims arising from fiscal years 2002–2011, as well as the IOUs' entitlement to REP benefits for fiscal years 2012–2028. *Id.*

broken down by year—for example, in FY 2012, the IOUs will collectively be paid $182.1 million, and in FY 2028, they will collectively be paid $286.1 million. ROD 30. Although the yearly lump sums are fixed, the payments to any *particular* IOU are not. Rather, the individual IOUs will still be required to file their ASCs with BPA every two years. Pursuant to section 5(c), if an IOU's ASC does not exceed the applicable exchange rate for a particular period, that IOU will not receive REP benefits for that period.[13]     The BPA Administrator, in his analysis of the Settlement, concluded that the net present value of the REP benefits under the Settlement—$2.05 billion—is approximately $1 billion less than the net present value of the projected REP benefits over the same period of time, should BPA continue to pay out REP benefits without the Settlement. ROD 59.

Second, the Settlement sets a new "rate test" methodology to meet the requirements of section 7(b). Under its traditional approach, BPA conducts a "rate test" every two years to determine the rate ceiling (i.e. the maximum rate that can be charged to COUs) and the PF Exchange rate. *See* 16 U.S.C. § 839e(b)(2). But under the Settlement, BPA prospectively conducted the rate test for each year of the Settlement. Thus, it ran seventeen separate rate tests, under which it determined the prospective cost of REP benefits (and the rate ceiling) for fiscal years 2012–2028, should the Settlement *not* take effect. In addition, it ran these tests using twenty-six different scenarios, to account for a range of different rate levels and litigation outcomes in the absence of the Settlement. BPA

---

[13] The Settlement sets forth a specific formula for determining whether an individual IOU qualifies for REP benefits, and if so, what amount of REP benefits it should receive. *See* ROD Appendix A 19–20. We discuss this formula *infra*, in Part III.A.1.b.

then compared the projected cost of REP benefits under these rate tests to the cost of REP benefits under the Settlement. It concluded that the COUs' interests were adequately protected, because in twenty-three of the twenty-six scenarios, the Settlement results in lower rates for the preference customers than would be allowed by the section 7(b)(2) rate ceiling absent the Settlement.[14]

Third, the Settlement provides a schedule of refunds to the COUs, who were overcharged under the terms of the 2000 REP Settlement Agreement. *See Golden Nw.*, 501 F.3d at 1048. The Settlement provides that the COUs can retain the refunds they have already received from BPA—which total $587 million, for the period fiscal years 2008–2011—without further dispute.[15] It also provides that BPA will continue to refund the COUs during fiscal years 2012–2019, paying a total of $612 million over the course of eight years. ROD 253. The mechanism for making these refunds is to withhold a certain amount of the IOUs' REP benefits, which the IOUs have agreed can be used to "pay for" the refunds to which the COUs are entitled.

E.

APAC is an "unincorporated *ad hoc* organization." It is composed of six member groups, all of whom own and

---

[14] The three scenarios in which the COUs' rates were higher under the Settlement were scenarios that presumed the COUs would prevail on all their major contested legal issues and the IOUs would prevail on none; BPA deemed this unlikely. ROD 80–81.

[15] These refunds are referred to by the parties as "Lookback Amounts," and are the subject of numerous pending petitions before this court. *See* ROD 13–15.

operate industrial facilities in the Pacific Northwest.[16] The member groups are not customers of BPA; rather, they purchase electricity from BPA's preference customers, the COUs. On appeal, APAC submitted an affidavit from the director of energy procurement at Georgia-Pacific LLP ("GP"), stating that GP contracts to buy power from two different COUs, the Clatskanie Public Utility District ("CPUD") and the Central Lincoln Public Utility District ("CLPUD").[17] The affidavit describes the contractual relationship between GP and CPUD as follows:

> The electrical contract between BP and CPUD is a cost-based pass-through contract according to which GP buys power from CPUD at CPUD's cost to purchase the power

---

[16] These groups are Georgia-Pacific LLC, Grays Harbor Paper LP, JR Simplot Co., Longview Fibre Paper and Packaging, Inc., Ponderay Newsprint Company, and Weyerhaeuser Company.

[17] APAC filed this affidavit with our court in order to establish standing. "Because Article III's standing requirement does not apply to agency proceedings, petitioners had no reason to include facts sufficient to establish standing as a part of the administrative record. We therefore consider the affidavit[] not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997).

APAC also submitted an affidavit from the general manager of a group called "Grays Harbor PUD." This affidavit addresses the former contractual relationship between "Grays Harbor Paper Company" and a COU, but suggests that Grays Harbor Paper Company no longer exists. It also fails to state whether Grays Harbor Paper Company is or was a member of APAC. Because we can resolve the question of standing on the basis of the affidavit from Georgia-Pacific LLP, we do not rely on the affidavit from Grays Harbor PUD.

> from BPA and other sources, plus additional charges for overhead. Thus the rates and charges incurred by CPUD to purchase power from BPA for the Wauna mill are recovered by GP.

The affidavit describes GP's contractual relationship with CLPUD in nearly identical terms.[18] As a result of these "pass through" contracts, GP claims to be "directly impacted financially by any rate increases or decreases adopted by BPA."

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Standing

We have jurisdiction to review the REP-12 Record of Decision, because it is a final agency action. *See* 16 U.S.C. § 839f(e)(5); *PGE*, 501 F.3d at 1023. At the outset, however, we must address an important threshold question: does APAC, a group whose members are not direct customers of BPA, have standing to challenge the Settlement? Our answer to this question requires two separate inquiries. First, we ask if at least one of APAC's members has "suffered sufficient injury to satisfy the 'case or controversy' requirement of Article III." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). Second, if APAC has established Article III standing, we "ask whether a statute has conferred 'standing' on [at least one of APAC's members]," *id.* at 1175, such that the member is "within [its] zone of interests," thereby

---

[18] In its description of GP's contractual relationship with CLPUD, the affidavit replaces "CPUD" with "CLPUD," deletes the phrase "and other sources," and replaces "Wauna mill" with "Toledo plant."

meeting the requirements for prudential standing, *Cent. Ariz. Water Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531, 1538 (9th Cir. 1993).[19]   We conclude that APAC has met the requirements for both constitutional and prudential standing, for the reasons explained below.

## 1. Constitutional Standing

The requirements for Article III standing are familiar. First, the petitioner must show that it has suffered "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted).   Second, it must show that the injury is "fairly traceable to the challenged action of the defendant," and is not "the result of the independent action of some third party not before the court."   *Id.* (quotation marks and alternations omitted).   Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."   *Id.* at 561 (quotation marks omitted).

---

[19] We consider the standing of APAC's individual members because an organization has standing to sue on behalf of its members if "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to vindicate are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"   *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1101–02 (9th Cir. 2004) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859–61 (9th Cir. 2005) (concluding that organization had standing because one of its members had standing).   BPA and the intervenors do not contend—nor do we have any reason to believe—that the latter two requirements are not satisfied.

We address each requirement in turn, focusing on whether it has been satisfied by one of APAC's members, GP.

### a. Injury in Fact

The alleged injury in this case is economic: according to APAC, its members will "suffer the burden" of over-inflated power rates, which BPA will set in order to ensure it can make the required REP payments to the IOUs.[20]  Put another way, the Settlement will cause BPA to set higher rates for the COUs, who will in turn set higher rates for members of APAC.  The intervening IOUs counter that "because APAC's members' rates are set by COUs, not BPA, they have no legal right to any particular rate under the NWPA," and thus do not have a legally protected interest in non-inflated rates.[21]  We disagree.

First, we must clarify that a petitioner's "legally protected interest" need not be a statutorily created interest.[22]  Thus, to

---

[20] APAC also argues that the Settlement fails to reimburse the COUs for illegal overcharges resulting from the 2000 REP Settlement Agreement, which we struck down in *PGE* and *Golden Northwest*.

[21] BPA does not dispute that APAC's members may suffer an injury in fact; it instead focuses on the second and third requirements for constitutional standing, arguing that "any burden imposed on APAC's members comes from the COUs that sell power to them," and any remedy must also come from the COUs.  *See infra*, at Part III.A.1.b–c.

[22] The intervening IOUs confuse two separate inquiries:  (1) the Article III "legally protected interest" inquiry, which is a part of establishing "injury-in-fact," and (2) the prudential standing inquiry, which looks to whether a relevant statute confers a right to sue upon a particular plaintiff.  But it is only after determining that "a plaintiff has suffered sufficient injury to satisfy Article III" that the court "ask[s] whether a *statute* has

the extent the parties and the dissent focus on whether APAC's members have a "right to any particular rate *under the [NWPA]*," Dissent at 67, their focus is too narrow.[23] We have previously held that "economic injury is generally a legally protected interest." *Cent. Ariz.*, 990 F.2d at 1537; *see also Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 980 (9th Cir. 2013) ("The economic costs of complying with a licensing scheme can be sufficient for standing."); *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."); *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) ("There is harm in paying rates that may be excessive . . . ."). And we have found standing where the petitioners' economic interest in an agency's action was created by contract, rather than by statute.[24] *Cent. Ariz.*, 990 F.3d at 1537–38.

---

conferred 'standing' on that plaintiff" as part of the prudential standing inquiry. *Cetacean Cmty.*, 386 F.3d at 1175 (emphasis added); *see also Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1224–25 (9th Cir. 2008).

[23] The exact requirements for a "legally protected interest" are far from clear. *See, e.g.*, *In re Special Grand Jury* 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006) (explaining that the term has "generated some confusion," but concluding that the interest need not be "protected by law . . . so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention); *Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 363 (D.C. Cir. 2005) (Williams, Senior J., concurring) (expressing "puzzlement" over the requirement and discussing the "powerful reasons" it should be interpreted to "simply reformulate[] pre-existing requirements, particularly that the interest affected be a *cognizable* one").

[24] The dissent misconstrues our explanation here that a legally protected interest need not be a statutorily created interest as a suggestion that it is "inappropriate to examine the statute in the context of a legally cognizable interest." *See* Dissent at 66, n.9. We make no such suggestion. Our

For example, in *Central Arizona*—a case with strikingly similar facts—the EPA had promulgated a rule requiring the owners of a power generating system to take steps to reduce its SO2 emissions. *Id.* at 1533–34. The petitioners, who purchased electricity from those owners, claimed "an economic interest in the Final Rule," arguing that they "[would] be required, due to [their] contractual relationship with the [owners], to repay a major portion of . . . the costs of installing and maintaining the emission controls required by the Final Rule." *Id.* at 1534. We held that the petitioners had standing to sue EPA, concluding, in part, that their pecuniary injury was "clearly a sufficient basis" upon which to establish an "injury in fact," as required by *Lujan*.[25] *Id.* at 1537 (quotation marks omitted).

Likewise, in *Maricopa-Stanfield Irrigation and Drainage District v. United States*, we held that the plaintiffs had

point is only that a legally protected interest can derive from a source *other than* a statute.

[25] The dissent asserts that *Central Arizona* is distinguishable because in that case EPA was acting in its regulatory capacity while in this case BPA acted "within its power to contract [with the COUs] by adopting the REP-12 Settlement Agreement." Dissent at 71. This distinction makes no difference. *Central Arizona* is analogous because, just as the pecuniary impact of EPA's regulations passed through to the purchasers of power from the generating system, the pecuniary impact of BPA's actions passed through to GP. The pass-through contracts that GP has with the two COUs discussed in GP's affidavit forms the basis for APAC's Article III standing. BPA's own authority to enter into a contractual relationship with the COUs does not somehow render GP a mere downstream customer without standing, as the dissent argues. Nor does it mean that GP seeks to establish standing by asserting the rights of a third party. *See* Dissent at 72–73. There is a direct correlation between the REP-12 Settlement and the costs that GP will shoulder. The alleged injury is GP's own, not that of the COUs or any other third party.

established "injury in fact" when the alleged unlawful act deprived them of rights they held under contract, not by statute. 158 F.3d 428, 435 (9th Cir. 1998). There, the plaintiffs were irrigation districts who claimed that the San Carlos Apache Tribe Water Rights Settlement Act of 1992 (the "SCAT Act") had resulted in the government taking their rights to certain water without just compensation. *Id.* at 433. We concluded that the plaintiffs had standing to bring the lawsuit, explaining in part:

> The Districts allege that, by reallocating the excess Ak-Chin water to the [Central Arizona Project], the Ak-Chin Settlement Act automatically reallocated that water to the non-Indian agricultural pool, which water the Districts had purchased under their 1984 subcontracts. If the Districts are correct in their assertion that the excess Ak-Chin water [should have] defaulted to them, then *the SCAT Act's reallocation of the excess Ak-Chin water . . . indirectly deprived the Districts of water due to them in their subcontracts*. Because a higher-priority right to a CAP water allocation is more valuable than a lower-priority right to the same water, *the Districts adequately have alleged that the SCAT Act deprived them of their legal rights to the excess Ak-Chin water allocation*.

*Id.* at 434 (emphasis added). Here, as in *Central Arizona* and *Maricopa-Stanfield*, GP has an interest in receiving whatever it is guaranteed under its contracts with the COUs. By alleging that the Settlement will directly affect the rates it is

charged, resulting in economic harm, GP has sufficiently established an invasion of a legally protected interest.[26]

But our inquiry does not end there. GP still must show that its harm is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted). The COUs argue that GP cannot meet these requirements, because APAC's members are not entitled to "any particular rate under the NWPA." We disagree.

The record shows that the "pass-through" contracts are just what their name suggests: under these contracts, GP's affidavit explains, GP "buys power from [the COUs] at [the COUs'] cost to purchase the power from BPA," such that "the rates and charges incurred by [the COUs] to purchase power from BPA . . . are recovered from" GP. Thus, BPA's argument that "any burden imposed on APAC's members comes from the COUs that sell power to them," and not from BPA, relies on technicalities at the expense of common sense. Under the terms of the Settlement, GP will almost certainly be charged a rate that directly reflects the rates BPA charges the COUs. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013) ("Our cases do not uniformly require

---

[26] The dissent devotes an extensive part of its discussion to confronting arguments on which we do not rely to hold that APAC has standing. For instance, we do not hold that APAC has standing because its members are "significant purchasers" of BPA power. *See* Dissent at 69. Nor do we hold that all downstream consumers of energy, including residential customers, have standing to challenge the Settlement or any other action by BPA. *See* Dissent at 67–68. Our holding is limited to the unique facts of this case. Further, because APAC filed an affidavit on behalf of GP, which is uncontested, we do not need to address the "burden of production" issue raised by the dissent. *See* Dissent at 62, n. 7.

plaintiffs to demonstrate that it is literally certain that the harms they identify will come about."). Although "the *extent* of [GP's] economic harm is not readily determinable," *Cent. Ariz.*, 990 F.2d at 1538 (emphasis added), the record reveals that if APAC prevails on the merits of its claims, "the [Settlement] will likely cause [GP] *some amount* of pecuniary harm," *id.*, due to the pass-through provisions in its contracts. *See Maricopa-Stanfield*, 158 F.3d at 434 ("If the SCAT Act reallocated water that became the Districts' property under the Ak-Chin Settlement Act, then the harm is certain even though its precise valuation may not be."); *see also Bennett v. Spear*, 520 U.S. 154, 168 (1997) ("Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured . . . ."). We therefore conclude that the evidentiary showing by APAC is sufficient to establish an actual, concrete harm that is neither conjectural nor hypothetical. *See Lujan*, 504 U.S. at 560.

### b. Fairly Traceable to Actions of BPA

We next turn to the second requirement for constitutional standing: that the alleged injury be "fairly traceable to the challenged action of the defendant," rather than to "the independent actions of some third party not before the court." *Id*. (alterations and quotation marks omitted). To satisfy this requirement, APAC need not show that BPA's actions are "the very last step in the chain of causation." *Bennett*, 520 U.S. at 169. Rather, APAC must show only that there are no *independent* actions of third parties that break the causal link between BPA's allegedly unlawful act—i.e., its adoption of the Settlement—and GP's economic harm. If there are no such independent actions, BPA's challenged actions may be

understood to have had a "determinative . . . effect upon the action" of the third party, which in turn will cause harm to GP. *Id*.; *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausible.'" (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)) (internal alteration omitted)).

Here, again, we find guidance in *Central Arizona*. As we explained there, the fact that the petitioners' "contractual obligations may provide the basis for its economic liability for the increased costs imposed by the Final Rule . . . hardly means that the Final Rule itself is not the direct cause of that liability." 990 F.2d at 1538. This statement rings even more true here, where the pass-through contracts *directly pass on* to GP whatever rates BPA charges the COUs. Indeed, it is difficult to imagine a causal chain in which the defendant's actions are more "determinative" of the actions of a third party—and, in turn, of the alleged harm done to GP. *See Bennett*, 520 U.S. at 169. To consider the COUs' rate-setting an "independent action," separate from BPA's rate-setting, simply "misses the point." *Cent. Ariz.*, 990 F.2d at 1538. Nor does it matter, as the dissent suggests, that the COUs may be able to depart from their contractual arrangements with APAC members. *See* Dissent at 74–75. This does not change the fact that the contractual rates GP will pay are directly correlated to the Settlement Agreement. We therefore conclude that APAC has shown that GP's alleged economic injury is "fairly traceable" to the challenged action of BPA—i.e., the adoption of the Settlement —such that its has satisfied the second requirement for Article III standing.

### c. Redressability

Finally, we consider the third requirement for Article III standing:    "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). We conclude that GP has satisfied this requirement for the same reasons it has satisfied the "fairly traceable" causation requirement.  If the Settlement turned out to be unlawful, we would invalidate the REP-12 Record of Decision; as a result, it could no longer be the source of any economic harm to GP. GP has therefore satisfied the third requirement for Article III standing, and as a result, we conclude that APAC has constitutional standing to challenge the Settlement.

### 2. Prudential Standing

We turn to the second standing inquiry:  the "judicially self-imposed" requirement of prudential standing.[27]  "For a

---

[27] APAC argues that BPA has waived any challenge to APAC's prudential standing by failing to raise it during the REP-12 proceedings before the agency.  Unlike Article III standing, the issue of a party's prudential standing can be waived if not raised in a timely manner.  *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 899 (9th Cir. 2000).  But here, BPA had no reason to challenge APAC's prudential standing before filing its answering brief, since REP proceedings are not subject to standing requirements.  *See Overton Power Dist. No. 5 v. O'Leary*, 73 F.3d 253, 257 (9th Cir. 1996) ("[I]t does not necessarily follow that a party able to participate in administrative proceedings therefore has standing to challenge agency decisions."); *see also* 16 U.S.C. § 839(3)(B) (stating that one of the purposes of the NWPA is "to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the

plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected or regulated by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (internal quotation marks and alteration omitted); *see also Cetacean Cmty.*, 386 F.3d at 1176 ("When a plaintiff seeks to challenge federal administrative action, section 10(a) [of the Administrative Procedure Act ('APA')] provides a mechanism to enforce the underlying substantive statute.").[28] To satisfy this requirement, "all that is required is a rough correspondence of the plaintiff's interests with the statutory purpose." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 870 (9th Cir. 2002). The test "'is not meant to be especially demanding' . . . keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)); *see also id.* (noting that "the benefit of any doubt goes to the plaintiff").

---

Columbia River System . . . and the public at large within the region" in "facilitating the orderly planning of the region's power system"). Thus, BPA has not waived this challenge.

[28] The "zone of interest" requirement derives from section 10 of the APA, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has "interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact." *Nat'l Credit Union Admin.*, 522 U.S. at 488.

Here, the interests of APAC's members clearly line up with the statutory purposes of the NWPA.[29]  APAC's members have an interest in purchasing low-cost power, which allows them to operate their businesses.  The statute, in turn, states that one of its purposes is "to provide that the customers of the [BPA] *and their consumers* continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements." 16 U.S.C. § 839(4) (emphasis added); *see also* 16 U.S.C. § 838g (explaining that "rate schedules . . . shall be fixed and established . . . with a view to encouraging the widest possible diversified use of electric power at the *lowest possible rates to consumers* consistent with sound business principles" (emphasis added)); § 839a(5) (defining "consumer" as "any end user of electric power").  The legislative history of the NWPA also shows that Congress intended for the customers of COUs to benefit from its protections.  *See* H.R. Rep. No. 96-976, pt. 2, at 36 (1980), reprinted in 1980 U.S.C.C.A.N. 6023, 6034 ("As an added protection against preference utilities *and their customers* suffering adverse economic consequences as a result of this legislation, section 7(b)(2) establishes a 'rate ceiling.'"

---

[29] In addition to arguing that the Settlement is unlawful because it violates the NWPA, APAC also argues that the Settlement is unlawful because it violates the Bonneville Power Act and related FERC regulations.  However, this argument is wrapped into APAC's argument that the Settlement violates the NWPA, insofar as the NWPA incorporates the relevant provisions of Bonneville Project Act.  16 U.S.C. § 839c(a) (stating that all power sales conducted pursuant to section 5 of the NWPA are "subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. § 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. §§ 832c, 832d]").  We therefore need not separately consider whether APAC's interests line up with the statutory purposes of the Bonneville Power Act.

(emphasis added)). On this basis, we conclude that the interests of APAC's members are more than "marginally related" to the purposes of the NWPA, and therefore they have satisfied the requirements for prudential standing. *See Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210.

In sum, we conclude that APAC has constitutional and prudential standing to challenge the Settlement. We therefore turn to the merits of the petition for review.

## B. Standard of Review

"Our review of BPA's actions is governed by the [APA]." *PGE*, 501 F.3d at 1023; *see also* 16 U.S.C. § 839f(e)(2). Thus, we will set aside the Record of Decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). "In determining whether BPA has acted in accordance with law, we defer to BPA's reasonable interpretations of its governing statutes." *Golden Nw.*, 501 F.3d at 1045; *see also Confederated Tribes of Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 928 (9th Cir. 2003) ("Due to the complex subject matter and BPA's factual and legal expertise, we give special, substantial deference to BPA's interpretation of the [NWPA].").

## III. ANALYSIS

## A. NWPA Section 5(c)

One of APAC's main arguments is that the Settlement does not comply with section 5(c) of the NWPA, which governs the process by which BPA implements the REP. *See* 16 U.S.C. § 839c(c). First, APAC argues that setting a lump

sum of REP benefits, rather than calculating REP benefits "on an individual IOU-by-IOU basis," violates section 5(c)(1). Second, APAC argues that BPA's waiver of the "in lieu" provision of section 5(c), 16 U.S.C. § 839c(c)(5), is unlawful. We conclude that the Settlement does not violate section 5(c) on either ground.

### 1. Section 5(c)(1)

We begin by clarifying the process for setting REP benefits. This is a three-step process: first, BPA estimates the aggregate amount of REP benefits to be paid to the IOUs for a given year, pursuant to section 7(b)(2); second, BPA uses that estimate to set the PF Exchange rate for a given year; third, BPA uses the PF Exchange rate to determine an *individual* IOU's REP Benefit, pursuant to section 5(c)(1). Thus, contrary to APAC's characterization of the process, BPA must always calculate the aggregate amount of REP benefits to be paid out in a given year prior to setting the PF Exchange rate for that year. *See* 16 U.S.C. § 839e(b)(2)(C). This is not a novel concept invented by the Settlement. As the BPA Administrator explained, "[i]f BPA does not know the total permissible cost of the REP after running the 7(b)(2) rate test, then BPA has no way of setting the PF Exchange rate." ROD 93.

What *is* a novel concept is that the Settlement obligates BPA to actually pay out the total amount of REP benefits it estimates under section 7(b). Put another way, *estimating* the aggregate amount of REP benefits to be paid is fundamentally different from actually *setting* that amount. We acknowledge that this is an important difference. But we fail to see how setting an aggregate amount of REP benefits is a violation of section 5(c), so long as the amount that is set is *less* than the

maximum possible REP benefits that could be distributed pursuant to section 7.  As the BPA Administrator explained, "it is section 7(b) that ultimately establishes the *amount* of the REP costs that BPA may recover in rates, while section 5(c) . . . establishes *how the REP benefits are distributed among the REP participants*."  ROD 93 (emphasis added).  We find this explanation helpful, as it clearly isolates what we must decide here:  so long as the amount of REP benefits under the Settlement is lawful—a question we address *infra* in Part III.B—all that we must decide is whether the process for setting and distributing those benefits among the individual IOUs complies with section 5(c).

### a. Setting REP Benefits for Individual IOUs

We therefore turn to section 5(c).  Under this provision, there are two requirements that BPA must follow when setting REP benefits for any given IOU.  First, "the Administrator shall acquire by purchase" the power that a utility "offers to sell . . . at [its] average system cost [ASC]." 16 U.S.C. § 839c(c)(1).  Second, "the Administrator shall . . . sell an equivalent amount of power to such utility" in return. *Id*.  As APAC reads section 5(c), these two directives necessarily require BPA to calculate an individual IOU's REP Benefit using the following formula, which we will call the "traditional section 5 formula":

**[(ASC - PF Exchange Rate) x (load)] =** *REP Benefit*

Thus, according to APAC, section 5(c) requires BPA to *first* calculate the PF Exchange rate, and *then*—on the basis of that rate, together with an IOU's ASC and load—calculate the

IOU's REP Benefit.[30]  But by setting a lump sum of REP benefits, APAC argues, the Settlement allows BPA to "back[] into the rate[] to produce [the] guaranteed REP benefits." APAC claims that this is a violation of section 5(c).

We disagree.  Although the traditional section 5 formula satisfies the requirements of section 5(c), it is not the *only* formula that would do so.  Of critical importance here, section 5(c) does not specify the rate at which BPA must sell power back to qualifying utilities; as the Administrator noted, "[s]ection 5(c) is notably silent on what rate BPA must use to sell its power to the utility."  ROD 93.  Thus, although BPA has traditionally calculated the REP Benefit using the PF Exchange rate, all that section 5 actually *requires* is for BPA to make the following calculation, where both italicized terms are variables:

**[(ASC - *Rate Charged by BPA*) x (load)] = *REP Benefit***

If BPA uses this basic formula with the goal of calculating the *maximum* REP benefit for any given IOU, it will effectively use the traditional section 5 formula—that is, it will figure out the PF Exchange rate, and it will base the REP Benefit on that rate.  How do we know this?  We know because the PF Exchange rate is the sum of BPA's base rate for power, 16 U.S.C. § 839e(b)(1), plus any supplemental charges triggered by the "rate ceiling," *id.* at (b)(3).  Thus, the PF Exchange rate is the *lowest* rate that BPA can charge the IOUs.  And, as the lowest rate possible, it necessarily creates

---

[30] Put in more mathematical terms, APAC argues that the value of the "REP Benefit" must be the dependent variable in the formula derived from section 5(c).

the largest possible difference with the ASC—which, in turn, results in the maximum possible REP Benefit.

But an IOU does not have to accept the maximum possible REP Benefit. *See, e.g.*, *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995) ("[A]bsent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties."). We agree with the Administrator that the IOUs are not prohibited from "taking fewer REP benefits than any otherwise would be entitled to under the law." ROD 91. And if an IOU accepts less than the maximum REP Benefit, the effect is simply that BPA will charge a higher rate to that IOU, in order to create a smaller difference between the ASC and the rate charged. Nothing in section 5 suggests that this is unlawful. *See* ROD 119 (concluding that "allowing the IOUs to waive their statutory rights to full REP benefits . . . results in lower rates for all COU ratepayers"). We therefore conclude that setting a pre-determined REP Benefit, as required by the Settlement, is not a violation of section 5 so long as the pre-determined benefit is *lower* than the maximum REP Benefit that would result from using the PF Exchange rate.[31]   *See* 16 U.S.C. § 839e(b)(2) (stating that the rates charged to the COUs "may not exceed" a certain rate, but not setting a minimum rate); *see also* ROD 94 ("Section 7(b)(2) creates only a cap—not a floor—on the aggregate amount of REP benefits that BPA

---

[31] This, of course, raises the "critical question" of "whether the aggregate REP benefits provided under the Settlement exceed what the [NWPA] permits." ROD 116. We address that question *infra* in Part III.B.

must pay to the exchanging utilities and include in rates.").[32] Here, the BPA Administrator concluded that the pre-determined REP benefits under the Settlement amount to approximately $1 billion less than what the IOUs would be entitled to without the Settlement, and therefore setting such a lump sum is not a violation of section 5(c)(1).

### b. Distributing REP Benefits Among the IOUs

Our inquiry could end there if we knew that every IOU would qualify for REP benefits for each of the seventeen years covered by the Settlement. If so, it would logically follow that no IOU could receive REP benefits beyond what they would be entitled to in the absence of the Settlement.[33] But here, it is not a foregone conclusion that every settling IOU will qualify for REP benefits in a given year. Rather, under the Settlement, each IOU is required to file its ASC

---

[32] We also reject APAC's argument that reference to "*a* Pacific Northwest electric utility," 16 U.S.C. § 839c(c)(1) (emphasis added), is evidence of "Congress' intent to provide benefits only on an IOU-specific basis." First, section 5(c)(1) is silent with respect to "calculating the exchange benefits for the IOUs as a class." ROD 92. We therefore defer to the Administrator's reasonable interpretation of section 5(c)(1), which allows BPA to settle its REP obligations. *Id.*; *see also* ROD 98 (explaining that under APAC's interpretation of section 5(c), "BPA has no choice but to implement the traditional REP," and in that case "there could be no settlement of the REP"); *PGE*, 501 F.3d at 1037 ("BPA has broad authority to settle claims under the NWPA."). Second, even under the Administrator's interpretation of section 5(c), BPA still must provide benefits on an IOU-specific basis, for the reasons discussed in this section.

[33] Put another way, if we start from two premises—first, that the total amount of aggregate REP benefits is lawful, and second, that the REP benefits are distributed proportionately among all IOUs—we must necessarily conclude that the total amount of REP benefits distributed to any *particular* IOU is lawful.

with BPA every two years, consistent with BPA's current methodology. ROD 111. BPA will then determine if the IOU qualifies for REP benefits by comparing the IOU's ASC to the "utility-specific exchange rate" established for that IOU. ROD 112. If the ASC is higher than the "utility specific exchange rate," BPA will calculate the IOU's REP benefits using the following formula, set forth in section 6 of the Settlement:

([(ASC - Base Rate) x (load)] X [(Total REP Settlement Benefits) / ($\sum$((ASC - Base Rate) x Load))]) + 6.2 Adjustment = REP Benefit

ROD Appendix A 19–20; *see also* ROD 376–77. Although complicated, this formula essentially serves one main purpose: it ensures that each qualifying IOU will receive an amount of REP benefits proportional to the difference between its ASC and the base rate for power.[34]

---

[34] The formula is best understood when broken into sub-parts. First, BPA will calculate the difference between an individual IOU's ASC and the base rate for power in that fiscal year, and multiply that amount by the IOU's power load:

   **(ASC - Base Rate) x (Load) = A**

The value of "A" will be different for each IOU, since it is dependent on that IOU's particular ASC and load.

   Second, BPA will divide the total amount of REP settlement benefits in a given year—that is, the lump sum provided for *all* IOUs in that year—by the total sum of all of the "A" values, as calculated for each IOU using the formula above:

APAC argues that it is unlawful for BPA to use a "formula not specified in the statute," for two reasons: first "BPA cannot assure that it will pay REP benefits only to those qualified IOU's that qualify for such a benefit," and second, it cannot assure that it will pay REP benefits "only in

---

**(Total REP Settlement Benefits) = B**

$\sum((\text{ASC - Base Rate}) \times \text{Load}))$

This creates a scaled value that will be the same for all IOUs, since it does not rely on any IOU-specific values.

Third, BPA will multiply A times B:

**([(ASC - Base Rate) x (Load)] X [(Total REP Settlement Benefits)/( $\sum$((ASC - Base Rate) x Load))]) = C**

This third step serves to divide the aggregate REP benefits among the IOUs in a way that is proportional to their ASCs: a higher ASC results in a greater difference between the ASC and the base rate, which results in a greater value for "A," which in turns results in a greater value for "C."

Finally, BPA will add the amount of any "6.2 adjustment," resulting in the final REP Benefit for that IOU:

**C + [Section 6.2 adjustment] = REP Benefit**

This final step involves a "reallocation" of REP benefits among the IOUs, which reflects the fact that the IOUs have not received equal refund payments from BPA thus far. ROD 120. Thus, "some [IOUs] have agreed to take a larger amount of rate protection in the calculation of their PF Exchange rate, while others have agreed to take less." ROD 121. This internal reallocation of benefits among the IOUs does not affect any other class of BPA ratepayers. *See id.* (concluding that "[n]othing in section 5(c), section 7(b)(2), or section 7(b)(3) prohibits the IOUs from waiving their rights to have rate protection dollars allocated on a pro rata basis among the PF Exchange rates").

the amount to which each qualified IOU is entitled under § 5(c)."

With respect to APAC's first argument, we agree that some IOUs *could* qualify for REP benefits under the Settlement even though they would not qualify for benefits absent the Settlement. The formula used in the Settlement requires BPA to calculate only "(ASC - Base Rate) x (Load)," as opposed to "(ASC - PF Exchange Rate) x (Load)," when deciding if an IOU qualifies for benefits. Because the base rate for power is necessarily lower than the PF Exchange rate, the former formula will allow more IOUs to qualify for REP benefits than the latter formula.[35]

But this is not unlawful. Although BPA has traditionally calculated REP benefits using the PF Exchange rate, section 5(c) does not prohibit BPA from selling power to the IOUs at rates lower than the PF Exchange rate. *See* ROD 94 ("Section 7(b)(2) does not require BPA to either pay the IOUs or charge the COUs in rates the *exact amount* of REP benefits established by a comparison of the utilities' ASCs and BPA's PF Exchange rate."). Rather, under its traditional approach, BPA has done so in order to ensure that the COUs' interests are protected under section 7. But once BPA has fulfilled its obligations under section 7, as it has under the Settlement,[36] section 5 does not impose any additional restrictions on the rate at which BPA must sell power to the IOUs. *See* ROD

---

[35] Consider, for example, a scenario where an IOU's ASC is 40.00, the base rate for power is 30.00, and the PF Exchange rate is 50.00. Under the formula used in the Settlement, the IOU would qualify for some portion of the REP benefits. Under the formula traditionally used, however the IOU would not qualify for any REP benefits, because 40 - 50 = -10.

[36] See discussion *infra* Part III.B.

115 ("Aggregate REP costs are determined pursuant to sections 7(b)(1) and 7(b)(2) of the Northwest Power Act. Once the size of the aggregate REP is determined, BPA will use ASCs, PF Exchange rates, and qualifying exchange load to determine each utility's REP benefits, whether under the Settlement or under no settlement."). Thus, even though more IOUs may qualify for REP Benefits under the Settlement than otherwise would qualify, the formula that BPA uses to determine eligibility still complies with section 5.

The same reasoning leads us to reject APAC's second argument, that some IOUs may receive a greater share of REP benefits than they are "entitled" to under section 5(c). Yet again, we agree with the factual premise of APAC's argument: if the total amount of REP benefits is a pie, and not every IOU gets a slice of the pie, the other IOUs will simply get corresponding bigger slices of pie.[37] Or, as APAC frames it, "each qualifying IOU will receive its proportional share of the fixed total annual amount of REP benefits provided in the Settlement regardless of the actual difference between its ASC and Exchange Rate." And we understand the intuitive concern that a particular IOU should not receive greater benefits under the Settlement than it would otherwise.

But here, again, we conclude that so long as the total amount of REP benefits distributed does not violate section 7, there is no statutory restriction on what *share* of those benefits any particular IOU may receive. As the Administrator explained, if "the IOUs wish to share among themselves a smaller amount of REP benefits through a fixed

---

[37] This would occur if one or more of the IOUs did not qualify for REP benefits under the formula set forth in the Settlement.

payment stream that settles future uncertainties . . . there is nothing in section 5(c) . . . that prohibits BPA from honoring such a decision." ROD 94. Thus, so long as "the aggregate level of REP benefits provided under the Settlement" comports with section 7, and "the distribution of those payments is being administered in a manner that closely resembles the REP envisioned by Congress in section 5(c)," the Settlement is "consistent with BPA's statutory authority and is consistent with law." ROD 115; *see also PGE*, 501 F.3d at 1037 (striking down the 2000 Settlement because it did not "resemble" the REP program created in section 5). And given the meticulous calculations that BPA will use to distribute the REP benefits proportionately among the IOUs, we too are "frankly at a loss as to how the Settlement . . . could be closer to the[] statutory requirements" of section 5(c).[38] ROD 115. We therefore agree with the Administrator that the Settlement's lump sum of REP benefits does not violate section 5(c)(1). *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

## 2. Section 5(c)(5) ("in lieu" powers)

We also reject APAC's argument that BPA violated section 5(c) by waiving its ability to make *in lieu* purchases pursuant to section 5(c)(5). *See* 16 U.S.C. § 839c(c)(5).[39]

---

[38] We further note that BPA staff "worked with the parties to test the formulas in the Settlement to ensure they would function over time," which included identifying a potential "anomalous scenario" that could occur if "BPA's cost of power was higher than *all* of the *IOUs'* cost of power." ROD 116–17.

[39] The *in-lieu* provision of section 5 provides: "Subject to the provisions of sections 839b and 839d of this title, in lieu of purchasing any amount of electric power offered by a utility under paragraph (1) of this

The *in lieu* provision of section 5 permits BPA, "in its discretion, [to] sell the IOUs actual power purchased from other sources in lieu of participating in the REP so long as BPA's cost for purchasing such power is less than the IOUs' cost to produce or secure their own power." *PGE*, 501 F.3d at 1022. Thus, in theory, BPA can reduce the costs of the REP by engaging in *in lieu* transactions, which involve the actual sale of power, rather than paper transactions.[40] We agree with the BPA Administrator's conclusion that BPA did not violate section 5(c) by waiving this authority. *See* ROD 129–34.

First, we agree with the Administrator that BPA's decision to engage, or not engage, in *in-lieu* transactions is entirely discretionary. *See* ROD 133. Indeed, the statute itself says only that BPA "*may*" engage in *in-lieu* transactions. 16 U.S.C. § 839c(c)(5) (emphasis added). "The permissive language and the absence of any legislative history lead us to conclude that the implementation of section 5(c)(5) is completely within the discretion of the BPA." *Cal. Energy*, 807 F.2d at 1462. Thus, the Administrator has interpreted section 5 as presenting "no statutory impediment" to BPA's waiving its *in-lieu* authority, so long as BPA provides "a reasoned decision for withholding [its] discretion

_____

subsection, the Administrator may acquire an equivalent amount of electric power from other sources to replace power sold to such utility as part of an exchange sale if the cost of such acquisition is less than the cost of purchasing the electric power offered by such utility." 16 U.S.C. § 839c(c)(5).

[40] In practice, however, BPA has never actually exercised this power. ROD 132; *see also Cal. Energy*, 807 F.2d at 1461 (explaining that *in-lieu* purchases are "but a minor feature of the exchange program created in section 5," with "only a very limited usefulness").

under the Settlement." ROD 131; *see also* ROD 133 (explaining that the "*discretionary* decision to engage in in-lieu transactions," pursuant to section 5(c)(5), is not "part of BPA's *obligation* to protect the rates of COUs under section 7(b)(2)").

This is not to say that it is *always* permissible for BPA to waive its *in-lieu* authority. As APAC points out, we have previously held—albeit under markedly different facts—that BPA would have "abused its discretion under 5(c)(5)" if it had "completely precluded itself from ever making in-lieu purchases." *Cal. Energy*, 897 F.2d at 1462 (concluding that the petitioner had not shown that the contract actually contained such a "complete ban on in-lieu sales of power"). In *California Energy*, however, the contracts at issue did not contain any limit on the amount of REP benefits that utilities might receive, meaning that the risk of waiving the *in-lieu* power—which is a means of keeping REP benefits in check—were much higher than in this case. This is consistent with the Administrator's observation that "[i]n a world where the IOUs' REP payments are determined rate case by rate case, it makes sense for the Administrator to retain his rights to engage in *in lieu* transactions to damper otherwise unknown REP costs." ROD 130.

Here, unlike in *California Energy*, there is a cap on the total amount of REP benefits the IOUs can receive under the Settlement, meaning that the cost of REP benefits will not suddenly spike in an unexpected way, as it could absent the Settlement. And BPA has provided a reasoned decision for waiving its *in-lieu* authority, taking into account the costs and benefits of doing so. Its primary reason for waiving this authority is "to achieve the substantial cost protections afforded by the Settlement," ROD 130, the certainty of which

would be undermined if BPA retained the power to add another variable to its rate calculations. Essentially, BPA has waived one way of controlling REP costs—the ability to engage in *in-lieu* transactions—for another, greater way of controlling REP costs, i.e., the Settlement. ROD 132–33. We agree with the BPA Administrator that this is a reasonable trade-off. Furthermore, we note that because the amount of REP benefits is set under the Settlement, the only effect of an *in-lieu* transaction would be to "adjust the amounts paid to each IOU," as opposed to creating "cost savings to BPA or any other ratepayers." ROD 131. This further supports BPA's decision to waive its *in-lieu* authority, because doing so does not deprive other ratepayers of a benefit they might otherwise receive. We therefore conclude that, under these facts, it was reasonable, and not unlawful, for BPA to waive its authority to engage in *in-lieu* transactions.

We likewise reject APAC's second argument, that "BPA, as a member of the executive branch," cannot contract away the powers given to it by Congress. Here, BPA is "acting as a private contracting party," and as a result, its "rights and duties are governed by law applicable to private parties unaltered by the government's sovereign status." *Kimberly Assocs. v. United States*, 261 F.3d 864, 869 (9th Cir. 2001); *see also PGE*, 501 F.3d at 1029 n.17 ("Unlike many regulatory agencies, 'Congress endowed the Administrator with broad-based powers to act in accordance with BPA's best business interests,' allowing BPA 'to function more like a business than a governmental regulatory agency.'" (quoting *APAC*, 126 F.3d at 1170)). BPA therefore did not err by waiving its ability to exercise one of its discretionary powers.

### B. NWPA Section 7(b)

APAC also argues that the Settlement does not comply with section 7(b) of the NWPA, under which BPA must calculate a "rate ceiling" to protect the COUs. *See* 16 U.S.C. § 839e(b)(2)–(3). Here, rather than challenging the "lump sum" term of the Settlement, APAC challenges the new methodology for running the "rate test" under section 7(b). As explained *supra*, under the Settlement, BPA ran the "rate test" prospectively for each year of the Settlement.

APAC argues that under section 7(b), BPA cannot use rate projections "that extend beyond five years," and therefore it cannot rely on its prospective rate tests for the entire term of the seventeen-year settlement. In support of this argument, APAC cites to the requirement that BPA must calculate the rate ceiling for any given year using projected power costs for that year, "plus the ensuing four years." 16 U.S.C. § 839e(b)(2); *see also id.* at (C) (explaining that BPA must calculate the rate ceiling by assuming that no REP benefits are paid out "during such five-year period"). This requirement, according to APAC, imposes "time constraints . . . which were designed to ensure that REP benefits must be based on current cost and load data." We disagree.

As APAC concedes, section 7(b) is silent with respect to how far in advance BPA can run the rate test for any given year. And the language APAC cites requires only that BPA use information from five separate years—the year in question, plus the following four years—to set rates for a single year. This requirement does not impose a restriction on running the section 7(b)(2) rate test in advance of a particular year; to the contrary, it supports the conclusion that BPA *can* rely on projected rates when running its rate tests.

In the absence of clear statutory language regarding how far in advance BPA can run its rate tests, we accord substantial deference to BPA's interpretation of section 7. *See PGE*, 501 F.3d at 1025. Here, the Administrator concluded that since BPA unquestionably has the legal authority to settle REP disputes, *see id.* at 1030, it must also be able to satisfy its section 7(b)(2) obligations by running the rate test for the term of the settlement. ROD 173–74. Otherwise, "there could never be a meaningful REP settlement," or at least not one that settled the dispute for longer than a five-year period. ROD 174. The Administrator thus explained:

> In a normal ratemaking context, where BPA revises its rates every two years in a contested environment, BPA conducts the 7(b)(2) rate test for the rate period plus four years to determine two-year rates. A REP settlement, however, resolves REP disputes for a longer term than a single rate period . . . . Therefore a REP settlement must satisfy section 7(b)(2) in a different manner from the rate test used to establish rates for a single rate period.

ROD 173. We conclude that this is a reasonable interpretation of section 7(b)(2). *See Chevron*, 467 U.S. at 843 & n.11 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction . . . ."). As BPA argues in its answering brief, section 7(b)(2) is not "a straitjacket that effectively prohibits settlement of the REP."

And the mere fact that BPA has *traditionally* calculated the rate ceiling on a two-year cycle does not mean that is the only legal method for running the test.[41]   Rather, it makes sense that BPA would run the rate test for a two-year period when setting rates for the upcoming two years, and for a seventeen-year period when setting rates for the upcoming seventeen years.

Nor does BPA's method of running the section 7(b)(2) rate test under the Settlement render the test "superfluous," as APAC argues.  The purpose of the rate test is not to ensure that BPA charges the COUs the exact amount at which the rate ceiling is set; the purpose is to ensure they are charged an amount no *higher* than the rate ceiling.  *See* 16 U.S.C. § 839e(b)(2).  Thus, contrary to APAC's argument, it does not matter if "the result of the § 7(b)(2) rate test can be directly, arithmetically linked" to the COUs' rates, so long as those rates to do not exceed the rate ceiling.  The section 7(b)(2) rate test plays an important role in the Settlement, insofar as it requires BPA to compare the lump sum of REP benefits to the projected rate ceilings, in order to ensure that the COUs would not be charged rates higher than the rate ceiling.  And to the extent the Settlement "pre-determine[s] the rate ceiling" by setting a lump sum of REP benefits, as APAC argues, it pre-determines a *lower* rate ceiling than would otherwise be set under section 7(b)(2).  This is not a violation of section 7(b)(2).

---

[41] Furthermore, as the BPA Administrator explained, the argument that "the duration of the 2012 Settlement . . . is unprecedented" not only fails to show that the Settlement is unlawful, it is also "simply wrong . . . . During the 1980s and 1990s, BPA negotiated REP settlement agreements and paid benefits under such agreements to 33 exchanging utilities, including all of BPA's exchanging preference customers, for terms up to 15 years."  ROD 201.

In addition to challenging the method of applying the section 7(b)(2) rate test, APAC also challenges its result. Thus, it argues that the Settlement violates section 7 because "the projected costs under some of the various scenarios in [BPA's] analysis did, in fact, exceed the § 7(b)(2) rate test." It is true that in three of the twenty-six scenarios, the COUs would not receive greater rate protection under the Settlement than they would without the Settlement.**42**  But these three scenarios involved "extreme instance[s] where the COUs prevail on multiple major contested issues and the IOUs succeed in virtually none of their issues." ROD 59; 198. Although we recognize the narrow possibility that a violation of section 7(b)(3) *could* occur if one of these scenarios presented itself, we are satisfied with the Administrator's conclusion that these "extreme" scenarios are unlikely to occur. ROD 80–81. "This is not to say that BPA could act contrary to a clear statutory directive in settling, but if there is room for doubt, we ought not to resolve it in a manner that sends the parties back to litigation." *Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989). Such is the case here.

---

**42** These twenty-six scenarios consisted of "four scenarios to analyze uncertainty in BPA's costs and [twenty-two] scenarios to analyze the possible impact of the litigation outcomes." ROD 56–58. As the Administrator noted, "the lower projected costs of the REP . . . are not mere ethereal guesswork." ROD 60. In making these projections, BPA considered "multiple variations on the key drivers of future REP benefits, i.e., ASCs, exchange loads, BPA's costs, litigation risks, and market variations." ROD 64. Thus, although the very nature of forecasting implies some uncertainty, the rates that BPA forecast cannot fairly be characterized as, in APAC's words, "pure speculation and conjecture."

## C. Cost Recovery Adjustment Clause

APAC next argues that the Settlement is unlawful because it does not permit BPA to apply a Cost Recovery Adjustment Clause ("CRAC") to the REP benefit levels. The CRAC is a rate mechanism by which BPA can adjust customers' rates when "changes in costs and revenues vary substantially from what BPA was projecting when setting rates," so that BPA is able to recover all of its costs. ROD 138; *see also Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 642 (9th Cir. 2005) ("The CRACs were created to allow the BPA to address any financial shortfalls without having to raise base rates."). APAC argues that by "guaranteeing the IOUs a fixed amount of REP benefits that BPA cannot adjust," the Settlement "excuses IOU customers from the CRAC," which means that other customers will bear the burden of assuring that BPA recovers its costs. We agree with the factual premise that BPA cannot apply a CRAC to the IOUs' REP benefit levels under the Settlement, even if BPA's costs are higher than expected. *See* ROD 134. We nevertheless reject APAC's argument, for two reasons.

First, as the BPA Administrator explained "CRACs are not required by the [NWPA]." Rather, they are a mechanism by which BPA exercises its statutory authority to "recover . . . the cost associated with the acquisition, conservation, and transmission of electric power." 16 U.S.C. § 839e(a)(1); *see also Cal. Energy Comm'n*, 909 F.2d at 1303 (explaining that section 7 "requires BPA, in marketing federal power, to establish rates that will produce sufficient revenues to ensure BPA's fiscal independence"). BPA thus has broad authority to determine if and how to apply a CRAC. *See, e.g.*, *Pub. Power Council*, 442 F.3d at 1211 (explaining that a CRAC is

"entirely bound up with BPA's rate making responsibilities, and we owe deference to the BPA in that area").

Second, to the extent APAC challenges BPA's exercise of this discretion, we reject this challenge.  The BPA Administrator concluded that it was reasonable to insulate the IOUs from a potential CRAC for two reasons:  first, the IOUs "will not receive any upside benefits during a rate period" if, for example, BPA is unexpectedly able to charge lower rates than expected; and second, "because the REP benefits are fixed, the IOUs' REP benefits payments would never be a contributing factor" to any unexpected costs that might trigger a CRAC.  ROD 135; *see also* ROD 137.  Thus, "the lack of a CRAC mechanism in the Settlement . . . [is] simply one of the trade-offs" of the Settlement, counter-balanced by other terms that are less beneficial to the IOUs.  ROD 136.  And while "COU customers may feel the brunt of a CRAC in a future rate case," the BPA Administrator concluded that "the discount the IOUs are taking in their REP benefits under the Settlement would . . . more than make-up for the small amount of CRAC contributions the IOUs would have provided under a no-settlement alternative."  ROD 139.  This was a reasonable conclusion.  *See Pac. Nw. Generating Co-op.*, 580 F.3d at 806 ("[W]e have identified the question of how best to further BPA's business interests consistent with its public mission as a statutory gap that Congress has left to BPA to fill." (quotation marks omitted)); *Pub. Power Council*, 442 F.3d at 1209 ("[W]e may not substitute our own judgment for that of BPA; we must simply assess whether BPA relied on improper factors, failed to consider an important aspect of the question, offered an explanation for its decision that runs counter to the evidence before it, or rendered a decision that is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." (quotation marks and alterations omitted)). We therefore conclude that the Administrator's decision to approve the Settlement without including a CRAC mechanism was neither unlawful nor unreasonable.

### D. Bonneville Power Act and FERC Regulations

#### 1.

In addition to arguing that the Settlement violates the NWPA, APAC also argues that the Settlement violates the Bonneville Project Act, 16 U.S.C. § 832d, and applicable FERC regulations, 18 C.F.R. §§ 300.1(b)(6), 300.21(e)(1), by setting rates for a period that exceeds five years.[43]

These sources require that contractual rates be equitably adjusted no less than once every five years. *See* 16. U.S.C. § 832d(a) ("Contracts entered into under this subsection shall contain . . . such provisions as the administrator and purchaser agree upon for the equitable adjustment of rates at appropriate intervals, *not less frequently than once in every five years* . . . ." (emphasis added)); 18 C.F.R. § 300.1(b)(6) ("Proposed rate approval period means the period for which confirmation and approval of the rate schedules is requested. This period must not exceed five years."); § 300.21(e)(1) (stating that rate-approval periods are "not to exceed a five-year period" unless FERC deems it appropriate). But, as BPA argues, "establishing costs is not the same as setting

---

[43] All power sales conducted pursuant to section 5 of the NWPA are "subject at all times to the preference and priority provisions of the Bonneville Project Act of 1937 (16 U.S.C. 832 and following) and, in particular, sections 4 and 5 thereof [16 U.S.C. §§ 832c, 832d]." 16 U.S.C. § 839c(a).

rates." Here, the Settlement sets a fixed amount of REP benefits that BPA will be required to *pay* over the term of the Settlement, but it does not set any rates, meaning the five-year limit on rate-setting is inapplicable. As the BPA Administrator explained,

> Establishing rates and establishing costs are two substantively different things. The Settlement establishes the amount of REP benefits provided to the IOUs over the Settlement term and thus the amount of REP costs included in preference customers' rates during that term. The Settlement does not establish rates.

ROD 203. Rather, the Settlement resolves disputes about REP costs and rate-making methodology, neither of which "must be revised every five years" by statute or regulation. ROD 202.

Furthermore, although the Settlement "pre-determines" REP benefits, that does not mean that it also pre-determines rates. As the Administrator explained, "ratemaking involves many steps, including a forecast of loads and resources; a determination of BPA's total revenue requirement; a forecast of market prices; an analysis of risk and its mitigation; a cost of service analysis; a rate design analysis; and additional steps." ROD 202. The Settlement itself likewise makes clear that BPA will continue to engage in ongoing rate-setting throughout the term of the Settlement. *See, e.g.*, ROD Appendix A 19 ("For each Fiscal Year, BPA will develop rates, in the Rate Proceeding for the applicable Rate Period, such that each IOU will be paid its IOU-Specific REP Settlement Benefit Amount as calculated for such Fiscal Year

pursuant to this section 6.").  Indeed, after the Administrator approved the Settlement, BPA conducted the "BP-12" rate proceeding to "establish[] power and transmission rates for FY 2012–2013."  ROD 25.  We thus conclude that the Settlement sets only costs, not rates, and therefore does not violate the five-year rate-setting limitations established by the Bonneville Power Act and FERC regulations.

2.

Next, APAC argues that the Settlement violates the Bonneville Power Act, 16 U.S.C. § 832d(a), because it does not permit BPA to cancel any contract with five years' notice. The Bonneville Power Act provides the following cancellation requirements for contracts:

> [I]n the case of a contract with any purchaser engaged in the business of selling electric energy to the general public, the contract shall provide that the administrator may cancel such contract upon five years' notice in writing *if in the judgment of the administrator any part of the electric energy purchased under such contract is likely to be needed* to satisfy the requirements of the said public bodies or cooperatives referred to in this chapter, and that such cancelation [sic] may be with respect to all or any part of the electric energy so purchased under said contract to the end that the preferential rights and priorities accorded public bodies and cooperatives under this chapter shall at all times be preserved.

16 U.S.C. § 832d(a) (emphasis added). We conclude that APAC's argument fails because such cancellation can occur only if "any part of the electric energy purchased under [the] contract is likely to be needed." But the Settlement does not deny the COUs' access to power, because the Settlement guarantees only REP benefits, not actual power, for the IOUs. *See generally Util. Reform Project*, 869 F.2d at 443–44 (concluding that a particular power exchange between BPA and certain IOUs was "properly viewed as an exchange, rather than a sale, of power," such that the five-year cancellation clause did not apply, because "BPA's right to obtain exchange energy" meant there would be "no net diminution to the federal system" and BPA would "therefore continue to have the ability to meet its preference customers' needs"). Thus, there is no possibility that, under the terms of the Settlement, BPA will be required to provide power to the IOUs, much less power that is needed elsewhere.

## E. Compliance with *PGE* and *Golden Northwest*

In addition to challenging the Settlement terms that provide benefits to the IOUs, APAC also raises a challenge to the terms that provide refunds to the COUs. APAC argues that the Settlement "fails to fulfill the mandate" of *PGE* and *Golden Northwest* because it "neither calculates the past overcharges nor provides for refunds with interest."[44] We find no merit to this argument. First, the Settlement addresses the overcharges by providing refunds for the COUs, in an amount totaling $612 million over eight years.

---

[44] APAC also argues that the Settlement does not comply with *PGE* and *Golden Northwest.* because it violates section 5 and section 7 of the NWPA. We reject this argument for the reasons explained in our analysis of those provisions, *supra*.

As the Administrator explained, this amount "reflects BPA's calculation of the outstanding Lookback Amount payments ($511 million), adjusted for interest earned over eights years." ROD 253.[45]  Second, the very nature of a settlement is that the parties forego certain benefits or rights to which they may have a cognizable legal claim, in exchange for something else—here, guaranteed refunds, future certainty, and the end to ongoing litigation.  Short of arguing that the parties to the Settlement have no right to settle, APAC cannot plausibly claim that the Settlement is invalid because it does not provide for the full amount of refunds to which the COUs may have been entitled, absent the Settlement.  "An agency's discretion is at its zenith when it is fashioning policies, *remedies* and sanctions . . . ." *Pub. Utils. Comm'n of State of Cal. v. F.E.R.C.*, 462 F.3d 1027, 1053 (9th Cir. 2006) (emphasis added) (internal quotation marks and alteration omitted).  We therefore will not disturb the Settlement's refund schedule for the COUs, which all settling parties agreed to and which the BPA Administrator approved.

## F. Enforcement of Settlement on Non-Binding Parties

APAC next argues that the Settlement is only a "partial settlement," which "does not resolve all claims between all adverse parties" and cannot bind the non-signatories.  This is true:  the Settlement cannot, and does not, bind any parties that have not signed it.  But this does not mean that BPA is

---

[45] After our decisions in *PGE* and *Golden Northwest*, but before the Administrator approved the Settlement, BPA provided partial refunds to the COUs for over-charges under the 2000 Settlement.  Adding these refunds to the $612 million guaranteed under the Settlement, "the total refund payments BPA will have made to the COUs will be approximately $1.2 billion."  ROD 253.

prohibited from setting the same rates for signing and non-signing parties. As BPA argues, it has the statutory authority to set rates and to recover costs through those rates, pursuant to section 7 of the NWPA. *See* 16 U.S.C. § 839e. So long as the Settlement complies with the relevant statutory authority—as we have concluded that it does—BPA does not need its customers to unanimously agree to the rates it sets in accordance with the Settlement. We agree with the Administrator's explanation of the Settlement:

> Non-signers are bound only in the sense that they will pay in rates the REP benefits provided under the Settlement, but only after BPA has independently found that the Settlement satisfies the requirements and protections set forth in the [NWPA]. This is not the same thing, though, as treating non-signers as if they have executed the Settlement. For example, pursuant to section 7.10 of the Settlement, signers may not "directly or indirectly challenge, either in whole or in part, the legality of the Settlement Agreement or any REP Settlement Implementation Agreement." Non-signers are not so limited.

ROD 348.[46]  In other words, our conclusion that BPA can lawfully set the same rates for signing and non-signing parties does not necessarily preclude non-signing parties from challenging those rates going forward.  *Cf.* ROD 325 ("[A]s a legal matter, BPA's decision to execute the Settlement (and therefore become a 'Party'), and BPA's decision to replace its previous disputed decisions with the Settlement and this ROD, may have an effect on [parties'] pending claims.").  We therefore conclude that the Settlement does not improperly bind non-settling parties to the Settlement.

### G. Fairness and Reasonableness of the Settlement

Finally, APAC argues that the Settlement is neither fair nor reasonable, and that the Administrator's conclusion to the contrary is "arbitrary and capricious."  *See* 5 U.S.C. § 706(2) (providing that a court shall "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  APAC essentially re-caps the same arguments we have rejected *supra*, arguing, *inter alia*, that the COUs have "forfeited" the protections of the section 7(b)(2) rate test, that several of the tested scenarios did not result in

---

[46] *See also* ROD 322 ("In terms of whether the Settlement provides equity to non-settling parties, BPA believes the non-settling parties are being treated equitably under the Settlement because they will benefit from the return of the Refund Amounts and resolution of the past refund payments."); ROD 361 ("The conclusion is that under most possible future results of the rate test, rates for COUs would be higher than the rates under the Settlement . . . . Thus, BPA is not imposing rates on non-signing customers that would deny such customers their statutory 7(b)(2) protection."); ROD 372 ("Because the Settlement is consistent with BPA's ratesetting directives, the statutory protections of non-settling entities are not being violated by the Settlement.").

lower REP benefits under the Settlement than would be distributed without the Settlement, that the Settlement improperly projects costs over a seventeen year period, that the Settlement improperly waives BPA's *in-lieu* power and prevents it from allocating CRAC costs to the IOUs, and that the Settlement's value to the COUs is "overstated," since the COUs are entitled to greater refunds pursuant to *PGE* and *Golden Northwest*. We reject these arguments for the reasons provided *supra*. The Settlement is lawful. Furthermore, the BPA Administrator engaged in an exhaustive evaluation of the Settlement, providing thorough analyses and conclusions for countless challenges raised during the administrative proceedings. We therefore conclude that the BPA Administrator's adoption of the REP-12 Settlement in the REP-12 Record of Decision was not arbitrary or capricious.

## IV. CONCLUSION

For the foregoing reasons, APAC's petition for review is **DENIED**.

ALARCÓN, Circuit Judge, dissenting:

I respectfully dissent.

In this matter, we must initially determine whether APAC,[1] a group whose members are not direct customers of BPA, has standing to challenge the REP-12 Settlement Agreement. BPA and the intervening parties,[2] some of whom supply electricity to APAC's members, contend that APAC's members lack standing to bring this challenge because they are not direct customers of BPA. APAC counters that it has standing on account of its members' cost-based pass-through contracts with the COUs.[3] I would deny the petition because

---

[1] APAC is the only party challenging the REP-12 Settlement Agreement. APAC's petition initially was consolidated with *Alcoa Inc. v. Bonneville Power Administration*, No. 11-73161. BPA and Alcoa later settled their dispute and agreed to dismiss that action under Rule 42(b) of the Federal Rules of Appellate Procedure. This Court dismissed Alcoa's petition with prejudice on December 18, 2012.

[2] Three groups of intervenors sought and were granted permission to intervene and file answering briefs: (1) Joint COUs; (2) Joint IOUs; and (3) State Commissions. These parties joined in BPA's arguments. The Joint IOUs separately challenge APAC's standing in their answering brief. APAC filed a motion to supplement the record with affidavits, which the court granted. BPA filed a response to APAC's motion to supplement the record with affidavits, contending that although it did not oppose APAC's motion, APAC's evidence failed to establish standing.

[3] APAC has previously challenged BPA's determinations in this Court. *See, e.g.*, *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin. (APAC)*, 126 F.3d 1158, 1163 (9th Cir. 1997); *Pub. Utils. Comm'n of Cal. v. FERC*, 814 F.2d 560 (9th Cir. 1987); *Aluminum Co. of Am. v. Bonneville Power Admin. (Alcoa)*, 903 F.2d 585, 587 (9th Cir. 1989). Of those cases, BPA disputed APAC's standing only in *APAC*. 126 F.3d at 1183 n.9. There, the Ninth Circuit declined to decide whether APAC had

it is my view that we lack the power to review its merits because APAC has failed to demonstrate that it has Article III standing. Accordingly, I am persuaded I lack the power to comment on the majority's opinion regarding the merits of APAC's petition.

I

Because standing was not at issue in the agency proceeding below, we must consider the question in the first instance. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) ("Questions of standing . . . may be raised and considered for the first time on appeal, including sua sponte." (citations omitted)). We must first consider whether at least one of APAC's members "suffered sufficient injury to satisfy the 'case or controversy' requirement of Article III."[4] *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). If APAC establishes Article III standing, we next would be required to determine whether one of its members has

standing to challenge BPA's final actions because it was uncontested that two other petitioners raising the same challenges in the proceeding had standing. *See id.* A ruling on APAC's standing is necessary here, however, because APAC is the only party challenging the REP-12 Settlement Agreement.

[4] An association like APAC has standing to bring suit on behalf of its members if: (1) at least one of its members had standing to bring this petition on its own; (2) by bringing this petition APAC sought to protect interests germane to its purpose; and (3) neither the claim brought nor relief sought by APAC requires individual members to participate in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Neither BPA nor the intervenors argue, nor is there any reason to believe, that APAC fails to satisfy the second and third elements of this test. The only inquiry, then, is whether at least one of APAC's individual members has standing under Article III.

prudential standing—"whether a statute has conferred 'standing'" on at least one of APAC's members, *id.* at 1175, such that the member falls "within [the statute's] zone of interests," *Cent. Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1538 (9th Cir. 1993) (internal quotation marks omitted).

## A

Article III of the United States Constitution limits the power of the courts to the resolution of actual "Cases" and "Controversies." U.S. Const., art. III, § 2; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "[T]he irreducible constitutional minimum of standing contains three elements": (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Thus, the party seeking to establish standing must show the "actual or imminent" "invasion of *a legally protected interest*" that is "fairly traceable to the challenged action" and is "likely . . . to be redressed by a favorable decision." *Id.* at 560–61 (emphasis added) (alterations, citations, and quotation marks omitted). The party seeking to establish jurisdiction—here, APAC—bears the burden of demonstrating standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006); *Lujan*, 504 U.S. at 561. When, as here, the party seeking to establish standing "is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

1

Both BPA and APAC rely on the NWPA's language and legislative history in making their respective standing arguments. Additionally, APAC supplemented the record on appeal with two affidavits.[5] Though slightly different, the affidavits establish that two of APAC's members purchase electricity from BPA's COU customers, which purchase power from BPA directly. Two of APAC's members have operated in the past[6] or currently operate facilities in the Pacific Northwest that manufacture goods from forest products. Georgia-Pacific LLC's ("GP") paper mill in Wauna, Washington accounts for approximately 70% of the total load served by its COU supplier, and its Toledo packaging and container-board mill accounts for approximately 40% of the load served by its COU supplier. APAC's members' agreements with the COUs are "cost-based pass-through" contracts by which members purchase power from the COUs at the COUs' cost of purchasing power from BPA—and, in some cases, other sources—plus any additional charges for overhead. As a result of these pass-

---

[5] We consider APAC's affidavits solely to determine whether APAC has standing. While a party may not supplement the record on appeal from an agency decision, this rule does not apply when a party attempts to establish standing. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997) ("Because Article III's standing requirement does not apply to agency proceedings, petitioners had no reason to include facts sufficient to establish standing as a part of the administrative record."). Standing was not at issue in the earlier proceedings. Accordingly, APAC may establish standing during the briefing phase. *Id.* at 1528.

[6] The Lovely Affidavit repeatedly uses the past tense when describing APAC's member. I accordingly assume this member is no longer in operation and no longer has a contract with the COU.

through contracts, "the rates and charges incurred by [the COUs] to purchase power from BPA . . . are recovered from [APAC's members]." And, while at least one member's supplier had the "right to depart from this arrangement upon giving the contractually required notice," the COU supplier "did not do so during the contract term." The affidavits state that APAC's members consequently "are directly impacted financially by any rate increases and decreases adopted by BPA."

BPA has not refuted or submitted supplemental evidence controverting these facts, though it argues they are insufficient to confer standing on APAC. Thus, the only question regarding APAC's standing is whether it submitted sufficient admissible evidence to support each element of standing by a substantial probability.[7]

_____

[7] The Ninth Circuit has not explicitly articulated the appropriate burden of production that a petitioner bears when directly appealing an agency decision, but suggested in *Northwest Environmental Defense Center* that the appropriate standard is a summary judgment standard. 117 F.3d at 1528–29; *Lujan*, 504 U.S. at 561 ("[F]acts that must be averred (at the summary judgment stage) [and] proved (at the trial stage) in order to establish standing . . . ."); *cf. Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir. 1992) (applying a summary judgment burden of production to an intervenor's evidence of standing submitted for the first time on appeal, where the challenged decision was resolved at summary judgment). The Court of Appeals for the District of Columbia, which handles a large docket of direct agency appeals, has adopted a summary judgment burden of production for petitioners seeking review of administrative actions. *See Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). Under this standard, the petitioner must demonstrate each element of standing "by a substantial probability" and "may carry its burden of production by citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Id.* at 899, 900–01; *see also Lujan*, 504 U.S. at 561 (stating that a plaintiff "must set forth by

2

To establish Article III standing, APAC must first demonstrate by a substantial probability that at least one of its members suffered or will suffer a injury in fact—the invasion of a legally protected interest that is concrete and particularized, and actual or imminent. *Lujan*, 504 U.S. at 560–61. APAC has not satisfied this burden.[8]

---

affidavit or other evidence specific facts" to support standing to survive a motion for summary judgment).

[8] I note that APAC's participation in the underlying agency proceeding does not confer standing because Article III's standing requirements do not apply to agency proceedings. *See Summers v. Earth Land Inst.*, 555 U.S. 488, 496 (2009); *Nw. Envtl. Def. Ctr.*, 117 F.3d at 1528. The rules governing standing to participate in agency proceedings are almost universally more permissive than the requirements for constitutional standing. *See, e.g.*, *Office of Commc'n of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C. Cir. 1966) (holding listening public's interest in programming content was sufficient to confer standing to intervene in FCC adjudicatory proceeding involving license renewal); *Scenic Hudson Preservation Conference v. Fed. Power Comm'n*, 354 F.2d 608 (2d Cir. 1965) (holding the "private attorney general" concept justifies intervention in agency hearing by those without a direct personal or economic interest in agency decision). Historically, courts and agencies have broadened public participation in agency proceedings on the theory that broad public participation allows interested persons and groups to express their views before agency policies are announced and implemented, eases the enforcement of administrative programs relying upon public cooperation, satisfies judicial demands that agencies observe the highest procedural standards, and increases public confidence in the fairness of administrative hearings. *See* Barry B. Boyer, *Funding Public Participation in Agency Proceedings: The Federal Trade Commission Experience*, 70 Geo. L.J. 51, 52 & n.6 (1981) ("[N]umerous legal and administrative victories . . . established broad rights of public participation in agency proceedings."); Roger C. Cramton, *The Why, Where and How of Broadened Public Participation in the Administrative Process*, 60 Geo. L.J. 525, 530–33

APAC claims the REP-12 Settlement harms its "concrete economic interests" in two ways: (1) it creates future harm by providing "unlawfully inflated" REP benefits to the IOUs; and (2) it perpetuates past harm by failing to redress the overcharges the COUs incurred (and in turn passed on to APAC's members) as a result of the 2000 REP Settlement. As to the former, APAC contends BPA recovers the cost of the REP benefits in the Settlement by increasing the COUs' rates, which pass through to APAC's members pursuant to their contracts with certain COUs. As to the latter, APAC notes that the REP-12 Settlement Agreement reimburses the COUs for overpayments by providing billing credits, or "Refund Amounts," in an attempt to cure the overcharges the Ninth Circuit declared improper in *Golden Northwest Aluminum, Inc. v. Bonneville Power Administration*, 501 F.3d 1037 (9th Cir. 2007), and *Portland General Electric Co. v. Bonneville Power Administration (PGE)*, 501 F.3d 1009 (9th Cir. 2007). APAC asserts these Refund Amounts are an "illusory fiction" and consequently fail to redress its members' past harm. APAC contends that if it cannot challenge the REP-12 Settlement Agreement, its members will never have an opportunity "to remedy those past wrongs."

It is undisputed that APAC's members do not contract with BPA for their power but instead contract with third-parties that in turn contract with BPA—here, some of BPA's

---

(1972); Reuel E. Schiller, *Enlarging the Administrative Polity: Administrative Law and the Changing Definition of Pluralism, 1945–1970*, 53 Vand. L. Rev. 1389, 1417 (2000) (starting in the 1940s, federal courts "chang[ed] a variety of administrative law doctrines in ways that increased judicial scrutiny of the administrative process and opened that process up to parties that it believed were systematically excluded").

COU customers. APAC contends that it has demonstrated that its members' rates directly rise and fall with the COUs' rates as a result of the "cost-based pass-through contracts" they have with the COUs, under which "[APAC] buys power from [a COU] at [the COU]'s cost to purchase the power from BPA, plus additional charges for overhead." BPA and the Joint IOUs argue these pass-through contracts are insufficient to confer standing. Specifically, BPA contends that APAC "has no relationship with BPA to support standing in this case" because its members are not BPA customers and do not have a direct relationship with BPA. As a result, BPA is not the party that sets the rates APAC's members pay, rather, the COUs do.

The general harm APAC claims—economic—has been recognized as a type of legally cognizable harm because paying excessive rates, either in the past or the future, is a concrete injury. *See Alcoa*, 903 F.2d at 590 ("There is harm in paying rates that may be excessive . . . ."); *see also Sierra Club*, 405 U.S. at 733–34 ("[E]conomic injuries have long been recognized as sufficient to lay the basis for standing . . . ."). While APAC identifies a legally cognizable *type* of harm, it nevertheless has failed to establish a legally cognizable interest because it cannot point to any right that would entitle its members to a particular rate. APAC maintains that its members' pass-through contracts with the COUs confer statutory and contractual rights. APAC asserts that its members' contracts with the COUs entitle those members to the rights the COUs enjoy pursuant to the NWPA and their direct contracts with BPA.

I first consider APAC's claimed statutory rights[9] under the NWPA. The NWPA identifies the three customer groups—COUs, IOUs, and DSIs—that fall within its purview and establishes guidelines and methodologies for calculating those customers' rates.[10] The NWPA requires BPA to promulgate these three groups' rates in compliance with certain statutory obligations. 16 U.S.C. §§ 839c(c)(5), e(b)(2). These statutory mandates do not, however, constrain the rates of downstream end users like APAC's members. *See id.* § 839e(b)(2) (providing guidelines for ratesetting relating to BPA's three direct customer groups). Furthermore, the NWPA distinguishes between a "customer," which it defines as "anyone who *contracts* for the purchase of power from the Administrator," *id.* § 839a(7) (emphasis added), and a "consumer," which it defines as "any end user

---

[9] The majority suggests that it is inappropriate to examine the statute in the context of a legally cognizable interest, and that instead we should look to the statute only when analyzing prudential standing. This Court's and the Supreme Court's jurisprudence suggest otherwise. *See, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("It is, of course, true that Congress may not confer jurisdiction on Article III federal courts to render advisory opinions. But Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." (citation and internal quotation marks omitted)); *Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 618–19 (9th Cir. 2008) (same); *Maricopa-Stanfield Irrigation & Drainage Dist. v. United States*, 158 F.3d 428, 435 (9th Cir. 1998) (stating that in construing a water district's subcontracts with the United States, this Court "must interpret them 'against the backdrop of the legislative scheme that authorized them, and . . . in light of the policies underlying the controlling legislation.'" (quoting *Peterson v. U.S. Dep't of Interior*, 899 F.2d 799, 807 (9th Cir. 1990))).

[10] While BPA may make sales to other parties under limited circumstances, APAC does not allege it purchased power from BPA under any of these circumstances.

of electric power," *id.* § 839a(5). Customers are entitled to specified rate protections, while "consumers" under the Act, like APAC's members and residential customers, are not. The NWPA refers to "consumers" in the "Congressional declaration of purpose," but one reference merely describes BPA's general policy of including an array of parties in its administrative proceedings,[11] including the "public at large," *id.* § 839(3), and a second states only that BPA's customers and their consumers should continue to bear the costs of administering the region's electric power requirements, *id.* § 839(4). Because the NWPA groups all "end users" into the broad "consumers" category—including end users like residential consumers—these brief references do not establish that APAC's members have the right to any particular rate under the Act.

Additionally, while the NWPA contemplates the involvement of consumers of BPA power in its administrative proceedings and recognizes that the NWPA may benefit many parties (including the general public), it does not provide protections to these indirect consumers in its rate-setting provisions. For example, the NWPA requires that the IOUs pass through their REP benefits to their *residential customers*. 16 U.S.C. § 839c(c)(3); *see PGE,* 501 F.3d at 1015. Thus, individual residential consumers of BPA power enjoy pass-through benefits from the IOUs, much as APAC's members enjoy pass-through rates from the COUs through their contracts. Thus, to the extent the majority would rest APAC's standing on the pass-through nature of its members' contracts, individual residential purchasers of BPA power

---

[11] As noted above, the underlying policy favoring the inclusion of a broad range of parties in administrative proceedings does not apply to Article III courts. *See supra* note 8.

would also have standing based on the same pass-through nature of their rates.

In addition, nothing in the NWPA's legislative history suggests that Congress, in insuring that the benefits flowing from BPA's direct customers' rates would pass to end users, intended to confer a right on the end users of BPA power, including all residential customers. For example, while Congress expressed a desire to protect "the customers of preference utilities" by implementing the Rate Ceiling,[12] Congress also stated repeatedly that it intended to benefit the IOUs' residential customers by implementing the REP.[13] Like the NWPA's statutory language, the Act's legislative history—which also recognizes the NWPA's benefit to indirect consumers—does not establish that indirect consumers have the right to any particular rate under the NWPA. Put differently, Congress's placement of restrictions on the rates that BPA's direct customers charge their

---

[12] *See* H.R. Rep. No. 96-976(II), at 35–36 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6023, 6033.

[13] *Id.* at 36 (noting that while the REP program *broadened residential customers' access to less expensive BPA power*, the concurrent implementation of the rate ceiling "added protection against preference utilities *and their customers* suffering the adverse and economic consequences as a result of [the NWPA]) (emphasis added); *see also PGE*, 501 F.3d at 1016; *Pub. Util. Comm'n of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 624 (9th Cir. 1985) ("One of the goals of the Act is to ensure that *residential customers* served by the Northwest IOU's have wholesale rate parity with *residential customers* served by publicly owned utilities and public cooperatives, BPA's preference customers." (emphasis added)).

customers does not confer a right on those indirect customers to challenge BPA's contracts with its direct customers.[14]

APAC responds that it is not just another downstream consumer of BPA power, but rather a "significant purchaser" of BPA power. To support this argument, APAC submits evidence, *inter alia*, that one of its members, GP, purchases 70% of the total load served by one of BPA's COUs, which in turn purchases 80% of its power from BPA. APAC's evidence, though scant, likely establishes that it is a "significant purchaser" of BPA power. But being a "significant purchaser" of BPA power does not itself establish that at least one of APAC's members has suffered a legally cognizable injury. This Court used the term "significant purchaser" of power in *Public Utility District No. 1 of Douglas County v. Bonneville Power Administration (PUD)*, 947 F.2d 386, 390 n.1 (9th Cir. 1991). There, in a footnote, we found that the intervenors–customers of certain public utilities alleged a sufficient injury where uncompensated losses to public utilities directly affected the customers' rates. *Id.* In reaching that conclusion, we noted that the entities were "significant purchasers of [BPA] power," but also relied on the intervenors–customers' *statutory right*,[15] under certain circumstances, to obtain compensation for monetary costs and power losses. *Id.* APAC similarly argues that BPA's adoption of the REP-12 Settlement Agreement will increase the COUs' rates, which in turn will increase the rates of APAC's members who are "significant purchasers" of BPA

---

[14] *See infra* note 19 and accompanying text.

[15] This case and others belie the majority's suggestion that this Court does not examine statutory rights when analyzing the injury-in-fact element. *See also supra* note 9.

power. Unlike the customers in *PUD*, however, APAC does not (and cannot) point to a statutory guarantee that its members will be charged a certain rate or a statutory mandate that the COUs pass on credits or refunds to APAC's members. Having pass-through contracts and being a "significant purchaser" without more, does not establish a legally cognizable injury.

APAC similarly cites *In re California Power Exchange Corp.*, 245 F.3d 1110 (9th Cir. 2001), for the proposition that "end-use (or retail) customers have standing when their serving utility's costs are increased." However, the holding in *California Power Exchange* was not so broad. There, the intervenor–city petitioned for mandamus to compel the FERC to take action on California wholesale power purchasers' requests for refunds. *In re Cal. Power Exch. Corp.*, 245 F.3d at 1119. This Court addressed the city's standing in a footnote, holding that the city—a public utility customer—had standing because it had been injured by "unjust and unreasonable short-term rate conditions in California (in the form of higher electricity bills), and any refunds owed to [the utility] would redress the City's injury, insofar as such refunds would flow through to [the utility's] customers in the form of rate reductions." *Id.* at 1124 n.14. The injury there was not speculative—we could conclude with certainty that any refunds to the utilities "would flow through" to the city because a *state statute* so provided. *See id.* (quoting and citing Cal. Pub. Util. Code § 332.1(2)). Thus, like the holding in *PUD*, the *California Energy* court's holding was narrow and relied on the petitioners' *statutory* right to compensation to establish certainty of injury and

redressability.[16] APAC has pointed to no such statutory right here.

Nor does APAC allege a legally cognizable injury arising from a contractual right. The majority's reliance on *Central Arizona Water Conservation District v. EPA*, 990 F.3d 1531 (9th Cir. 1993) is misplaced. In *Central Arizona*, this Court held that the petitioners—a water district and four related irrigation districts—had standing to challenge an EPA regulation that required a generating station to reduce sulfur dioxide emissions by 90%. *Id.* at 1537–38. We held the petitioners, as direct customers of the generating station, established an injury in fact where they were "contractually required" to repay the generating station "the major portion of" costs relating to the station's compliance with the EPA order. *Id.* at 1534, 1537–38. APAC argues, and the majority opinion suggests, that EPA and BPA are analogous in that both engaged in agency determinations that affected indirect parties and consequently that these indirect parties both have standing to challenge the agency determination. However, this comparison ignores that in this instance BPA occupies a role that is distinct from the EPA's regulatory role, in that BPA was acting within its power to contract by adopting the REP-12 Settlement Agreement. Accordingly, BPA is analogous to the generating station that *directly contracted* with the water and irrigation districts. In contrast to those directly contracting customers, APAC's members are merely downstream retail customers.

---

[16] While APAC cites to the Rate Ceiling Test and provisions of the NWPA to demonstrate that its members enjoy various protections under the NWPA, for the reasons set forth above, these provisions do not confer rights on consumers like APAC, but rather only on BPA's direct customers.

The facts here are also distinguishable from the second contractual case on which the majority relies, *Maricopa-Stanfield*, where the Ninth Circuit held that the plaintiffs established "injury in fact." 158 F.3d at 435. There, the plaintiffs were irrigation districts who claimed that adoption of the San Carlos Apache Tribe Water Rights Settlement Act of 1992 ("SCAT Act") resulted in the government taking their rights to certain water without just compensation. *Id.* at 433. There, we concluded that irrigation district alleged a legally cognizable injury. However, the irrigation districts' legal rights arose from their *direct contracts with the United States*. *See id.* at 431 ("Each of the Districts entered into a subcontract *with the United States Department of the Interior* . . . ." (emphasis added)), 434 (noting that the districts demonstrated a legally cognizable injury because they alleged that "the SCAT Act's reallocation . . . indirectly deprived the Districts of water due to them *in their subcontracts*" (emphasis added)). Unlike the irrigation districts in *Maricopa-Stanfield*, APAC's members cannot point to an entitlement in a direct contract with an agency of the United States. And, contrary to the majority's suggestion otherwise, neither *Central Arizona* nor *Maricopa-Stanfield* stand for the proposition that a downstream retail customer can establish an injury in fact.

"It is . . . a fundamental restriction on our authority that in the ordinary course, a litigant must assert *his or her own legal rights and interests*, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. ___, ___, 133 S. Ct. 2653, 2663 (2013) (emphasis added) (internal quotation marks and alteration omitted). APAC attempts here to assert the COUs' statutory and contractual rights, where APAC's members lack their own. This Court has never found standing under such

circumstances. I would not extend standing here and would hold that APAC has failed to demonstrate that its members suffered a legally cognizable injury.

3

Similarly, I would conclude that APAC also has failed to demonstrate causation and redressability by a substantial probability. "Traceability and redressability are linked causation requirements that look in different directions." Donald Doernberg & C. Keith Wingate, *Federal Courts, Federalism and Separation of Powers*: *Cases and Materials* 54 (2d ed. 2000). "Traceability" or causation is backward-looking and refers to whether a party's injury arises from the alleged wrongful conduct. *Id.*; *see also M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 843 (9th Cir. 2002) (stating that to demonstrate causation, a party must establish that its injury is "fairly traceable to the challenged action of the [agency], and not the result of the independent action of some third party not before the court" (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). "Redressability," on the other hand, is forward-looking and considers whether the relief requested is likely to improve the situation for the party requesting it. Doernberg & Wingate, *supra*, at 54. Thus, APAC must demonstrate that a favorable decision here would create "a significant increase in the likelihood that [APAC's members] would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). APAC fails to establish causation and redressability because of a fatal flaw common to both queries—the COUs independent decisions have a significant effect on APAC's members' alleged harm and prevent this Court from redressing that alleged harm.

When an alleged injury arises from government action relating to a third party, as here, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. ___, ___, 133 S. Ct. 1138, 1150 (2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). Indeed, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. APAC has not met its burden here.

BPA and the Joint IOUs contend that the lack of a direct contractual relationship between APAC and BPA renders APAC unable to establish causation and redressability. BPA argues that "any burden imposed on APAC's members comes from the COUs that sell power to them," rather than from BPA. Similarly, the Joint IOUs assert that APAC's alleged injury will not be redressed by a favorable decision here because such redress would depend on the actions of third parties—the COUs with whom APAC contracts. In response, APAC argues, and the majority agrees, that the "pass-through nature" of its members' contracts with the COUs prevents the COUs from acting as "independent" third parties. As such, APAC claims a favorable ruling here would redress its members' harm by restoring their pre-Settlement rates.

Contrary to the majority's conclusion, the COUs' "independent decisions" do have a "significant effect" on APAC's members' alleged harm. *See Allen*, 468 U.S. at 759. As noted above, at least one member's contract with its COU supplier allowed the COU to depart from the parties'

contractual arrangement by providing notice. Furthermore, as direct BPA customers, the COUs are statutorily entitled to enter into contracts with BPA, including contracts that settle rate disputes with BPA and waive their rights to BPA benefits to which they otherwise would be entitled under the NWPA. *See PUD*, 947 F.2d at 396 ("[N]othing in the statute suggests that a non-Federal project cannot waive its right to compensation."); *Avista Corp. v. Bonneville Power Admin.*, 380 F. App'x 652, 654–55 (9th Cir. 2010) (holding that IOUs can waive their REP benefits because nothing in § 5 "preclude[s] waiver of benefits"). It makes little sense that the statute would allow the COUs to waive such rights, but also allow the COUs' customers to challenge such waivers. When entering into settlement agreements, parties often give up rights to which they otherwise would be entitled in exchange for predictability. This Settlement is a compromise by which the contracting parties agreed to give up the possibility, *inter alia*, of more REP benefits, lower rates, or more refunds—in exchange for greater certainty and lower litigation costs. That is precisely what APAC's COU suppliers[17] did here—they waived their rights to potentially higher reimbursements of past overcharges.[18] The rights the

---

[17] All of the Joint COUs entered into the REP-12 Settlement Agreement. "[S]ome of the Joint COUs" supply power to APAC. Thus, at least "some" of APAC's COU suppliers agreed to the REP-12 Settlement Agreement and also intervened in this action to oppose APAC's petition.

[18] In their brief, the Joint COUs explain why they joined the REP-12 Settlement and gave up potential rights in exchange for certainty:

> APAC also claims [the REP-12 Settlement] is unreasonable because *all* the risk is on the side of the COUs. This assertion is not credible. The COUs—who, unlike APAC, have a direct stake in the settlement—overwhelmingly supported and joined the

COUs gave up are valuable, but so is predictability. APAC's members cannot now step into the COUs' shoes to challenge the Settlement.[19]

---

Settlement. No COU has challenged the Settlement here as being unreasonable or inconsistent with its statutory rights. In supporting the Settlement before BPA, the COUs explained the serious risks they faced in the absence of the Settlement and their belief that settlement was the only reasonable way for them to achieve, within a reasonable time frame, the certainty regarding the REP they need to conduct their business.

[19] The parties rely on principles of contract law in their briefs. Although not explicitly adopting the term "intended beneficiary," the parties appear to present differing views regarding whether APAC, on account of its pass-through contracts, is an intended third-party beneficiary of BPA's agreements with the COUs. Since the parties rely on principles of contract law in making their arguments, contract law relating to third-party beneficiaries is instructive here. First, state law applies to a determination of whether APAC is a third-party beneficiary of the COUs' contracts with BPA. *See Snohomish Cnty. Pub. Util. Dist. No. 1 v. Pacificorp (SCPUD)*, 745 F. Supp. 1581, 1584 (D. Or. 1990). In Oregon and Washington, courts have held that intent to include a third-party beneficiary in a contract must appear from the terms of the contract construed as a whole and in light of the circumstances in existence at the time the contract was entered into. *See Aetna Cas. & Surety Co. v. Or. Health Scis. Univ.*, 773 P.2d 1320, *rev. allowed* 781 P.2d 1214 (Or. Ct. App. 1989); *Postlewait Constr., Inc. v. Great Am. Ins. Co.*, 720 P.2d 805, 806–07 (Wash. 1986). The parties to a contract must intend that the promisor assume a direct obligation to the intended beneficiary. *Postlewait*, 720 P.2d at 806. In the absence of this direct benefit, the third-party beneficiary is merely an "incidental" beneficiary that acquires no rights under the contract. *Id.* Failure to name the third-party beneficiary, while not dispositive, is a strong indication that the promisee did not intend to confer a benefit on that party. *Nw. Airlines v. Crosetti Bros.*, 483 P.2d 70, 73 (Or. 1971).

APAC is not the correct party to adjudicate the claims in this petition. "[T]he standing inquiry requires careful judicial examination of [the facts supporting standing] to ascertain whether *the particular plaintiff* is entitled to an adjudication of the particular claims asserted." *Allen*, 468 U.S. at 752 (emphasis added); *see Hollingsworth*, 570 U.S. at ___, 133 S. Ct. at 2663 ("It is . . . a fundamental restriction on our authority that in the ordinary course, a litigant must assert *his or her own legal rights and interests*, and cannot rest a claim to relief on the legal rights or interests of third parties." (emphasis added) (internal quotation marks and alterations omitted)). APAC's remedy, if any, lies with the COUs with which its members contract. APAC's statement that "BPA's preference customer utilities are fiduciaries for their customers who actually incurred costs resulting from BPA's unlawful treatment of the REP costs pursuant to the 2007 Decisions" only supports the conclusion that APAC's remedy is not against BPA—which has no duty to APAC—but rather against the COUs, which (according to APAC) owe fiduciary duties to its members.

---

Here, APAC has not argued or offered evidence that the COUs' contracts with BPA name APAC's members as beneficiaries, nor is there any indication from the contract terms or circumstances that BPA and the COUs intended to confer rights on the COUs' customers. At most, the statutory language indicates APAC members could be construed as incidental beneficiaries that acquire no enforceable rights. *See SCPUD*, 745 F. Supp. at 1584 (holding a local utility district lacked standing to bring a declaratory relief action in a contract dispute between an IOU and a joint operating agency because the utility failed to demonstrate a cognizable injury or a personal stake in the contracts at issue; the fact that the local utility districts might "receive the benefit of lower rates due to [the IOUs] participation" in the contracts was not sufficient to confer third-party standing or to establish an injury in fact).

Moreover, APAC has not established that the perpetuation of APAC's past harm is fairly traceable to BPA. APAC's evidence demonstrates that the rates BPA charges its utilities pass through to the utilities' customers, but does not demonstrate that any credits or refunds for past overcharges also pass from the utilities to APAC's members. This is important because APAC's alleged past harm arises from these overcharges and the perpetuation of this harm arises from the Settlement's alleged failure to remedy this harm. Unlike the indirect customers in *California Power Energy* and *PUD*, APAC does not point to a statute that would entitle its members to such refunds. And, unlike the direct customers in *Maricopa-Stanfield*, it cannot rely on a contractual right with BPA that would entitle its members to such refunds. If the COUs are able to amend their contracts, retain these refunds, or account for them in a manner that would not directly lower APAC's members' rates, any action by this Court would not redress APAC's harm. Given that at least one of APAC's member's supplier was able to alter the terms of the pass-through contract upon notice, APAC has not established by a substantial certainty that a favorable ruling here would provide its members with the relief they seek. APAC carries the burden of supporting each element of standing with admissible evidence and has failed to do so.

I conclude that APAC has failed to establish standing under Article III of the United States Constitution because it has not demonstrated by a substantial probability that at least one of its members has a legally cognizable injury that is fairly traceable to BPA's adoption of the REP-12 Settlement, or that granting this petition would redress its harms. For these reasons, I would hold that this Court lacks jurisdiction to reach the merits of APAC's contentions.

## CONCLUSION

As I would conclude that APAC lacks standing, I would deny APAC's petition for review.